**DEMOCRATIC CENTRAL COMMITTEE OF the DISTRICT OF COLUMBIA et al., Petitioners,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,**

**D. C. Transit System, Inc., Intervenor.**

**No. 21865.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 23, 1970.

Decided June 28, 1973.

Rehearing Denied Sept. 25, 1973.

Landon G. Dowdey, Washington, D. C., with whom S. David Levy, Neil J. Cohen and William A. Grant, Washington, D. C., were on the brief, for petitioners.

Douglas N. Schneider, Jr., Gen. Counsel, Washington Metropolitan Area Transit Commission, Washington, D. C., for respondent.

Harvey M. Spear, New York City, for intervenor.

Before ROBINSON and MacKINNON, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This petition subjects to review Order No. 773 of the Washington Metropolitan Area Transit Commission [1] in an aspect untouched by today's *Powell* decision.[2] Petitioners assert, as their major contention, that the Commission should have taken into account, in the fare-setting process leading to that order, the amount by which properties which Transit had transferred from operating to nonoperating status had appreciated in value while in service. We conclude, in the circumstances peculiar to Transit as a public utility, that the Commission erred in refusing to treat the excess of market value over book value of the properties when transferred as an offset to higher fares.[3] To that extent we hold Order No. 773 invalid and direct the remedial steps to be taken. In the other respect in which the order is complained of, we affirm the Commission.[4]

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

1. D.C. Transit Sys., Inc. (Order No. 773), 72 P.U.R.3d 113 (WMATC 1968).

2. Powell v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. —, 485 F.2d 1080 (1973).

3. See also Bebchick v. Washington Metropolitan Area Transit Comm'n, No. 23,720, 158 U.S.App.D.C. —, 485 F.2d 858 (1973) ; Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, No. 24,398, 158 U.S.App.D.C. —, 485 F.2d 886 (1973).

4. See note 16, *infra*.

## I

### BACKGROUND

The evolution of Order No. 773 is summarized in our *Powell* opinion.[5] We need add only the events of record which bear particularly on the transferred assets.[6] All are parcels of real estate which in times past were employed by Transit in mass transportation operations, but which, after later losing their usefulness for that purpose, were withdrawn from service. These withdrawals are reflected by entries on Transit's books recording the removals—in utility jargon, from "above the line" to "below the line"—and denoting Transit's continuing interest in the properties as investments. In some instances, Transit retains direct ownership; in others, Transit has conveyed to a wholly-owned subsidiary, and in still others it has made an outright sale. It appears without controversy that the market value of

the unsold properties at the time of transfer below the line has invariably exceeded their value as tabulated on Transit's books.[7]

During the course of the proceeding before the Commission, petitioners endeavored to probe into Transit's below-the-line real estate, Transit's interrelationships with its subsidiaries, and the market value of withdrawn realty held by either. Transit resisted those efforts, maintaining that the properties belonged exclusively to its investors,[8] and that information concerning them was irrelevant to the fare investigation in which the Commission was engaged.[9] The Commission, subscribing to Transit's basic premise, ruled that petitioners' inquiries had but limited pertinence to the proceeding.[10] It directed that some of the sought-after information be made available to petitioners, but refused to require disclosure of any market-value data on the properties.[11]

5. Powell v. Washington Metropolitan Area Transit Comm'n, *supra* note 2, 158 U.S. App.D.C. at —— – ——, 485 F.2d at 788.

6. Many important facts pertaining to these properties are in dispute. We need not, for present purposes, undertake to resolve the disputes, and in any event we are not in position to do so. Simply as a point of reference, we reproduce, as an appendix to this opinion, the representation made in the Commission's brief, a1 to a3, in Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 3. Our disposition of this case includes prominently a direction to the Commission to identify the properties and the material facts as to each. See Part V, *infra*, following note 387.

7. Witnesses before the Commission had so testified, and Transit's counsel conceded as much.

8. In speaking of Transit's "investors" we employ the language of ratemaking litigation. We are fully aware of the fact that Transit is a wholly-owned subsidiary of another corporation.

9. Transit's counsel argued
 that it is virtually axiomatic that non-depreciable property upon which no return is allowed, upon which no depreciation is allowable, and non-operating property upon which no return is al-

lowed in a rate base proceeding, and upon which no depreciation is allowed, are both matters which are not properly within the province of a rate proceeding.
Counsel had earlier assumed a broader position:
 [T]he appraised market value of non-operating property does not belong in a rate proceeding. It is not part of what this Commission can consider as far as the rate of return is concerned, and it is not part of what affects the rate structure which any member of the public pays. If there is a loss on the sale of that real estate the stockholders bear it, and if there is a profit on the sale it goes to the stockholders of the company. . . . [N]one of these items requested here today as to nonoperating properties are relevant in this proceeding . . . and the company will decline to furnish that information at this time because we don't think it is relevant.

10. See note 11, *infra*.

11. The Commission's chairman declared "that the proceeds from non-operating property belong to the stockholders of the company and not to the rate-payer," but felt that the information requested was not completely irrelevant. Since some of the information had been supplied the Commission's staff by Transit, the chair-

Not surprisingly, then, Order No. 773 reflects no consideration whatever by the Commission of rises in the value of the transferred assets during the course of structuring the increased fares which that order awarded. Petitioners filed a timely petition for reconsideration [12] containing, *inter alia*, what may fairly be characterized as a request that the Commission devise ways and means of giving Transit's farepayers appropriate credit for the appreciation in value of the properties while in service. By Order No. 781, the Commission denied the petition,[13] and by Order No. 781a stated its reasons for doing so.[14] The Commission's statement, like Order No. 773 itself, is devoid of anything which we can identify as a response to petitioners' entreaty. And so it is that the theory underlying their plea is presented here,[15] now to support the charge that the Commission was grievously in error.[16]

We have painstakingly examined this serious charge in all of its many ramifications, and in this opinion we set forth the results of our investigation. We begin in Part II with an exploration into the adjudicative history, administrative and judicial, of allocations of capital gains on operating utility assets. After that, in Part III, we scrutinize the interest of investors in value-appreciations on such assets, with reference to treatments of that interest in rate- and depreciation-base formulations and, more particularly, in Transit's ratemaking litigation. Next, in Part IV, we identify the doctrinal considerations guiding allocations of capital gains on in-service utili-

man instructed the staff to make certain of it available to petitioners' counsel. The chairman ruled, however, that neither the staff nor Transit would be required to disclose information regarding the current market value of the properties, and, addressing petitioners' counsel, that "[i]f that is information you think is pertinent or you think should be in the record it will be up to you . . . to adduce that evidence." Petitioners, later undertaking something of a showing as to market value of the properties, introduced the valuation of the properties for tax purposes and testimony assuming that the assessments approximated 55% of true market value.

12. See Washington Metropolitan Area Transit Regulation Compact, tit. II, art. XII, § 16 (Transit Regulation Compact), incorporated into Pub.L. No. 86–794, 74 Stat. 1031 (1960), with amendments, appearing as a part of Pub.L. No. 87–767, 76 Stat. 764 (1962), set forth following D.C.Code § 1–1410a (1967). Title III of the Transit Regulation Compact is the Washington Metropolitan Area Transit Authority Compact (Transit Authority Compact), which is incorporated into Pub. L. No. 89–774, 80 Stat. 1324 (1966), and is set forth following D.C.Code § 1–1431 (1967). In this opinion, we refer to the Transit Regulation Compact and the Transit Authority Compact together as the "Compact."

13. D.C. Transit Sys., Inc. (Order No. 781) (WMATC Feb. 26, 1968) (unreported).

14. D.C. Transit Sys., Inc. (Order No. 781a), 74 P.U.R.3d 178 (WMATC 1968).

15. See Compact, *supra* note 12, tit. II, art. XII, § 17.

16. Petitioners also allude to several other complaints they have against Order No. 773, and ask for remand of the case to the Commission for reconsideration in light of Williams v. Washington Metropolitan Area Transit Comm'n, 134 U.S. App.D.C. 342, 415 F.2d 922 (en banc 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969), and Payne. v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. 321, 415 F.2d 901 (1968). In their brief, however, petitioners offer no argument whatever in support of these points. We accordingly decline to consider them. Fed. R.App.P. 20, 28(a)(4); D.C.Cir.R. 4(b) (5); Cratty v. United States, 82 U.S. App.D.C. 236, 243, 163 F.2d 844, 851 (1947); Abrams v. American Sec. & Trust Co., 72 App.D.C. 79, 80, 111 F.2d 520, 521, 129 A.L.R. 368 (1940); S. S. Kresge Co. v. Kenney, 66 App.D.C. 274, 275 n. 1, 86 F.2d 651, 652 n. 1 (1936); Smith v. Pickford, 66 App.D.C. 206, 209 n. 6, 85 F.2d 705, 708 n. 6 (1936); Schwartzman v. Lloyd, 65 App.D.C. 216, 218, 82 F.2d 822, 824 (1936); Helvering v. Helmholz, 64 App.D.C. 114, 117, 75 F.2d 245, 248 (1934), aff'd, 296 U.S. 93, 56 S.Ct. 68, 80 L.Ed. 76 (1935); Ginder v. Giuffrida, 61 App.D.C. 338, 340, 62 F.2d 877, 879 (1932); Wardman-Justice Motors v. Petrie, 59 App.D.C. 262, 267, 39 F.2d 512, 517, 69 A.L.R. 648 (1930).

ty property and apply them to this case. Then concluding that Order No. 773 is invalid and must be set aside, we specify in Part V the basis for and mechanics of remediation.

## II

## ADJUDICATIVE HISTORY OF ALLOCATION OF CAPITAL GAINS ON OPERATING UTILITY ASSETS

Seldom have regulatory agencies or courts been called upon to allocate, as between investors and consumers, gains on utility assets while in operating status.[17] Nonetheless, for the assistance and indispensable background they may afford to resolution of the controversy at hand, we must pause to examine this group of cases. In the realization that problems of allocation may well differ according to whether the asset is depreciable [18] or nondepreciable, we look first to the decisions treating allocation issues in relation to depreciable properties.

### A. *Depreciable Assets*
### *Out-of-District Cases*

Outside the District of Columbia, we find relatively little authority precisely in point. In 1959, the question was presented to the Appellate Division of the New Jersey Superior Court [19] after a utility providing water service made a profitable sale of a portion of its distribution system, consisting of cast-iron mains and fire hydrants.[20] In subsequent rate proceedings, the New Jersey Board of Public Utility Commissioners deducted the profit from the utility's earned surplus and credited it to its depreciation reserve, in conformity with the board-adopted uniform system of accounts for water companies. From 1931, when the sale was made, to 1958, when the rate case was instituted, the utility had not complained of this treatment. Ascribing controlling weight to the commissioners' long standing construction of their own regulation—the accounting system prescribed—the court found no error in the challenged adjustment.[21]

In the same year, a similar question arose in a rate proceeding before the Minnesota Railroad and Warehouse Commission.[22] During its historical test period, a transit company sold obsolete buses and treated the proceeds as nonoperating income. This was held to be improper.[23] "The Uniform System of Accounts prescribed by this Commission," said the agency, "requires that such salvage [24] 'shall be credited to the

---

17. No issue as to allocation of capital gains and losses once an asset is transferred below the line is tendered to us on this review.

18. We use the word "depreciation," as it is commonly employed in District rate-making, to refer not merely to physical wear and tear but also to other types of diminution of serviceability. *E. g.,* D.C. Transit Sys., Inc. (Order No. 245), 48 P.U.R.3d 385, 397 (WMATC 1963), remanded sub nom. D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 121 U.S.App.D.C. 375, 350 F. 2d 753 (en banc 1965), on remand sub nom. D.C. Transit Sys., Inc. (Order No. 563), 63 P.U.R.3d 32 (WMATC 1966), rev'd sub nom. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, where the Commission said:

Depreciation is the exhaustion of the service life of the property in use. The accrued depreciation in the property at a given time is the sum total of the exhausted service life of the various units of the property at that time. This exhaustion of service life is the combined result of the working of three factors, namely: (1) inadequacy, (2) obsolescence, and (3) physical deterioration.

19. In re Revision in Rates Filed by Plainfield-Union Water Co., 57 N.J.Super. 158, 154 A.2d 201 (1959).

20. 154 A.2d at 205, 211.

21. 154 A.2d at 211.

22. Minneapolis St. Ry. Co., 31 P.U.R.3d 141 (Minn. R.R. and Warehouse Comm'n 1959).

23. *Id.* at 152.

24. The agency's reference to salvage, viewed in context, is seemingly to the entire proceeds of sale, and not simply to the amount of future recoupment originally estimated for depreciation-computation purposes.

depreciation reserve account.' " [25] In its words, the agency accordingly "added this income from sale of obsolete buses to operating income in determining actual operating results. . . ." [26] "[A]ny further income from sale of obsolete buses or equipment," the agency added, "will be treated . . . as a reduction in depreciation expense and, thus, as an increase in operating income." [27]

A few years later, the Wyoming Public Service Commission faced essentially the same problem in a variant context.[28] A utility engaged in selling natural gas purchased mineral interests in lands, including a gas-producing well. The utility thus became entitled to a depletion allowance on the purchased assets.[29] After taking some gas from the purchased properties for its southern division customers, the utility sold them at a profit. Regulatory approval of the sale had been accompanied by a direction to treat the profit as utility income. In a later rate proceeding, the Commission reiterated its position that the profit "must be treated as nonoperating utility income." [30] The theory underlying the order approving the sale, the Commission said, was that "the profit to be made by the company upon the sale thereof should be used to reduce its . . . natural gas rates, rather than increase them." [31] "As we view the transaction," the Commission explained, "the company will simply make the substantial profit from the sale of utility properties dedicated to its southern division operations, which, in our opinion, should inure to the benefit of the ratepayers in that division." [32]

Such are the decisions outside this jurisdiction. In each, the entire gain from disposition of depreciable assets was passed on to the utility's consumers, to the exclusion of its investors. While it is true that two of the decisions were influenced by agency-adopted accounting practices, it must be remembered that such practices are but reflections in accounting technique of what is generally considered wholesome in substantive principle. And the principle to be gleaned, both from the practices and the decisions themselves, is that consumers have the superior claim on capital gains achieved when depreciable utility properties are removed from service. We do not suggest that so small a number of cases establish a rule of general and controlling applicability in the ratemaking field. But it can hardly be denied that these decisions are precedents of value in similar litigation.

### —District Cases

Within, much as without, the District of Columbia the problems of allocating value-appreciation of depreciable in-service utility property have but infrequently arisen before either regulatory agencies or courts. And the litigation locally, such as it has been, has invariably involved Transit and, by the same token, the peculiarities inherent in its situation. That is to say not only that the reasoning followed elsewhere obtains as to Transit, but also that additional reasons leading to similar results flow from Transit's uniqueness, in comparison with other utilities, with respect to properties transferred below the line. Not surprisingly, then, the claim of Transit's farepayers on capital gains accruing to such properties while above the line has achieved considerable fruition.

The leading case, and one which merits careful analysis, is D.C. Transit System, Inc. (Order No. 4577).[33] There the Commission's predecessor, the District

---

25. 31 P.U.R.3d at 152.

26. *Id.*

27. *Id.*

28. Wyoming Gas Co., 40 P.U.R.3d 509 (1961) (Wyo.Pub.Serv.Comm'n 1961).

29. See Part V(A), *infra*, at note 222.

30. 40 P.U.R.3d at 513.

31. *Id.*

32. *Id.*

33. 30 P.U.R.3d 405 (D.C.Pub.Utils. Comm'n 1959).

of Columbia Public Utilities Commission (PUC),[34] addressed the question of allocating the profits on a sale of Transit's Fourth Street Shops and Southern Carhouse to the District of Columbia Redevelopment Land Agency. Of the total sale price of $3,320,000, Transit proposed to credit all of the net profit of $2,181,363.08 to earned surplus, and thereby to pass it on to its investors.[35] This, PUC held, it could not be permitted to do.

As PUC determined, $1,039,657.72 of the sale price was attributable to land,[36] $1,915,034.81 to depreciable improvements on the land,[37] and the remainder to items not of present concern.[38] PUC noted that strict adherence to the uniform system of accounts employed by it would require that the total amount received on disposition of depreciable assets—here $1,915,034.81—be credited to the depreciation reserve as salvage.[39] Since to have done that would, by PUC's calculations, have built the reserve to a point greatly in excess of the sum needed to retire all unrecovered original cost

of the improvements,[40] PUC felt that a departure from normal accounting procedures was warranted.[41]

In regard to the extent of the departure, PUC noted that Transit's operating franchise demanded of it a seven-year program of gradual conversion from a streetcar-bus to an all-bus operation,[42] and PUC was "unable to disassociate the instant transaction from the imminent retirement of all rail property under the mandate contained in the Franchise." [43] Nor could PUC "ignore the probability that full provision for depreciation will not have been provided when the rail facilities are abandoned and retired by reason of conversion." [44] Observing that Transit had consistently asserted, and PUC's staff had indicated agreement, that any retirement loss in this connection was recoverable by charges against the farepayers,[45] PUC emphasized that "if the customers are to be required to bear the burden of extraordinary retirement losses incident to the whole conversion program, it appears equitable that they should share, at least to some extent, in extraordinary

34. Now the District of Columbia Public Service Commission.

35. 30 P.U.R.3d at 406.

36. *Id.* at 407, 409. So, after subtracting $89,089.17, representing the original cost of the land, a net profit of $950,568.55 was realized on this aspect of the sale. *Id.* at 407, 409, 411.

37. *Id.* at 409. Original cost of this portion of the sold property was determined to be $1,077,824.06. *Id.* The depreciation reserve on the improvements was then $613,661.28, leaving $464,162.78 as the unrecovered original cost. *Id.* at 411. Thus net profit on the sale of the depreciable portion of the property was $1,450,872.03—the sale price of $1,915,-034.81 less unrecovered original cost of $464,162.78.

38. See *id.* at 407–409. A part of the remainder was $36,550.92, net, representing so much of the sale price as was related to certain equipment and machinery. Because of uncertainty as to the items of equipment and machinery included in the sale, PUC placed that amount in a suspense account pending ascertainment, "at which time determination will be

made as to what portion thereof should be credited to the depreciation reserve and what portion, if any, should be credited to earned surplus." *Id.* at 409.

39. *Id.* at 410.

40. The unrecovered portion of original cost was $464,162.78, that is, original cost of $1,077,824.06 less depreciation reserve of $613,661.28. See note 37, *supra.*

41. 30 P.U.R.3d at 410.

42. Transit had purchased the assets of Capital Transit Company, its predecessor, which for many years had operated a system of transportation by streetcars and buses in the Washington metropolitan area. The obvious purpose of the franchise provision mentioned in text was to eliminate the streetcars. This matter is discussed more fully in Part IV(B), *infra.*

43. 30 P.U.R.3d at 412.

44. *Id.*

45. *Id.* That such losses did fall on Transit's farepayers subsequently became the fact. See Part IV(B), *infra*, at notes 243–246.

retirement gains of the nature here under consideration." [46]

PUC concluded, then, that of the total net profit of $1,450,872.03 realized on the sale of the improvements,[47] $613,661.28 should inure to Transit's consumers and $837,210.75 to its investors.[48] "This approach," it said, "takes into consideration the right of the company to recover from its customers through depreciation the loss of service value over the life of the property as measured by the original cost of the property less net salvage realized upon retirement." [49] That treatment, in PUC's view, "provides an equitable solution to a difficult problem maintaining, as far as possible, what seems to be fair balance between the interests of the public and those of the company's investors." [50]

PUC's allocation of the profit on the improvements on the Fourth Street Shops and Southern Carhouse subsequently came under direct judicial review at Transit's instance, and we held that PUC's treatment was not arbitrary or unreasonable.[51] That allocation also entered into this court's consideration of another problem several years later. In D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission,[52] an expense allowance to Transit for unrecovered costs of abandoned rail facilities was contested on grounds which included reference to that sale. The argument was that the sale was occasioned by the conversion program required by Transit's franchise,[53] and that for that reason the profits made on the sale should be regarded as recoupment of obsolescence.[54] In rejecting the argument, we noted that

PUC did not omit to give the riding public some considerable share in the benefits of this sale. . . . [T]he profit on the depreciable property which went into surplus was $837,000. At the time of the sale, Transit carried this property on its books at an historical cost of $1,077,824, with an accrued depreciation reserve of $613,661. Thus only $464,163 was reto effect complete liquidation of this investment. The PUC, however, ordered a total of $1,077,824 be credited to the depreciation reserve, representing not only the $464,163 but an additional amount of $613,661 exactly duplicating the reserve already accrued. It was this action that we think was explained by the PUC's comment that equitable consideration suggested the riders should share in the profits from the sale. Under all these circumstances, therefore, we do not interfere with the Commission's discretion in deciding not to off-set the profits from the Fourth Street Shop sale against the [expense allowance for unrecouped investment in abandoned rail facilities].[55]

That, as PUC held in Order No. 4577,[56] Transit's farepayers have a legitimate interest in capital gains on operating depreciable assets has never been doubted by its successor, the respondent Commission. In D.C. Transit System, Inc. (Order No. 245),[57] the Commission recognized that "ratepayers may have a claim to depreciable property at least to the extent of the depreciation re-

---

46. 30 P.U.R.3d at 412.

47. See note 37, *supra*.

48. 30 P.U.R.3d at 411.

49. *Id.*

50. *Id.* at 412.

51. D. C. Transit Sys., Inc. v. Public Utils. Comm'n, 110 U.S.App.D.C. 241, 292 F. 2d 734 (1961). See also Part III(B), *infra*, at notes 89–99.

52. *Supra* note 18.

53. See note 42, *supra*, and accompanying text.

54. 121 U.S.App.D.C. at 397, 350 F.2d at 775. The same argument was made with reference to a capital gain achieved on the depreciable portion of Transit's Georgia and Eastern Terminal. We discuss the disposition of that facet of the argument in Part IV(B), *infra*, at notes 292–300.

55. *Id.* (footnote omitted).

56. See text *supra* at notes 34–50.

57. *Supra* note 18.

serves." [58] It added "that 'gains' may be experienced on disposal of depreciable items, and these are indeed used as off-sets to depreciation, under the heading of 'salvage' ".[59] Later, in D.C. Transit System, Inc. (Order No. 563),[60] the Commission, in finding no connection between Transit's track removal and re-paving program and its sale of its Georgia and Eastern Terminal,[61] concluded that "the ratepayer is not entitled to share in any portion of the proceeds of that sale, unless there was a profit on the depreciable portion of the asset sold," [62] and found that "[t]here was none in this case." [63] And even after issuance of the order under review, the Commission has declared that "[t]here is no question that, when depreciable operating property is sold and a gain is realized, the gain should be used to reduce the depreciation expenses which ratepayers have paid but which the company, because of the gain, does not actually incur." [64]

In the District, then, the law on the topic immediately under discussion is already somewhat developed. Capital gains realized on disposition of depreciable assets while in service [65] do not automatically flow to Transit's investors,[66] although extraordinary circumstances may enable them to share.[67] On the contrary, Transit's farepayers have a protectible interest in such gains which extends at the very least, to the amount of depreciation which has been charged to farepayers and may well extend far beyond.[68]

## B. *Nondepreciable Assets*

The question whether a gain on disposition of nondepreciable assets inures to investors as capital surplus, or to consumers as a reduction in cost of service, has been litigated even less frequently than has the question in relation to depreciable assets. A survey of the few cases in point outside the District of Columbia reveals, somewhat paradoxically, a central strand of harmony amid diverse results. The decisions within the District—all administrative—have reached a uniform result, but without critical analysis either of the problem or the precedents.

### —*Out-of-District Cases*

In New York Water Service Corporation v. Public Service Commission,[69] a utility sold, at a handsome profit, land which had outworn its usefulness as a storage reservoir. Its regulatory agency held that for ratemaking purposes the net profit reaped on the sale should be passed on to its customers.[70] On judi-

---

58. 48 P.U.R.3d at 399.

59. *Id.* at 404.

60. *Supra* note 18.

61. See note 287, *infra*, and accompanying text.

62. 63 P.U.R.3d at 34.

63. *Id.*

64. D.C. Transit Sys., Inc. (Order No. 1090), 85 P.U.R.3d 508, 513 (WMATC 1970).

65. It may, of course, be that in given situations no gain is realized. That was so in D.C. Transit Sys., Inc. (Order No. 563), *supra* note 18, discussed in text *supra* at notes 60–63.

66. This is clear from all of the decisions in the District.

67. As in D.C. Transit Sys., Inc. (Order No. 4577), *supra* note 33. See text *supra* at notes 39–41.

68. As in D.C. Transit Sys., Inc. (Order No. 4577), *supra* note 33. See text *supra* at notes 47–50.

69. 12 A.D.2d 122, 208 N.Y.S.2d 857 (1960).

70. New York Water Serv. Corp., 7 P.U.R. 3d 32 (N.Y.Pub.Serv.Comm'n 1955). The commission felt that amortization of the profit from the sale over a seventeen-year period was "the most equitable method of meeting the problem." *Id.* It directed the utility to transfer the amount of the profit from surplus to a reserve account and in each future year to amortize one-seventeenth against the depreciation accruals charged to operations. *Id.*

cial review, that adjudication was sustained.[71] The court explained:

> The uniform system of accounts approved by the Commission applicable to water companies in dealing with land used for utility purposes allows land sold at a loss to be debited to the depreciation reserve and thus increase the rate base. If land is sold at a profit, it is required that the profit be added to, i. e., "credited to", the depreciation reserve, so that there is a corresponding reduction of the rate base and resulting return. The utility is thus protected from a loss in the sale of the land in its operations; it seems reasonable it should pass on a profit to the consumer.[72]

As the opinion on review makes plain, the guiding principle was that the gain belonged to those—investors or consumers—who previously bore the risk of loss from possible decline in market value.

In City of Lexington v. Lexington Water Company,[73] the pertinent facts were similar. The utility had acquired land which for many years it used to collect water for reservoirs, but when the reservoirs became inadequate the land was retired from service and removed from the utility's rate base. Somewhat later, the land was sold,[74] and the utility distributed the very considerable profit realized thereon to its investors as dividends.[75] When the utility

subsequently sought a rate increase, its regulatory agency ruled that its consumers were entitled to the gain.[76] The agency, articulating essentially the same rationale espoused in *New York Water Service Corporation,* elucidated:

> The question arises, should this gain, made on property devoted to the public service over the years, be used to reduce the cost of service to the customers or should it be treated as a capital surplus item, and be allowed to be paid out to the stockholders . . . ? Having considered the evidence and arguments relating to this matter, we are of the opinion that it should be used to reduce the cost of service to the consumer.
>
> The subject property was not purchased by the utility as a land speculation but it was acquired for providing utility service to the public over the years and was subject to acquisition by condemnation.[77] Inasmuch as utility property necessary for rendering service to the public is not subject to sale at the option of the utility, but must be continued in service as long as needed to provide that service, any loss in service value of such property would properly be considered a cost of providing service and, in the case of depreciable property, is recovered through depreciation. . . . For nondepreciable property, where the

---

71. New York Water Serv. Corp. v. Public Serv. Comm'n, *supra* note 69, 208 N.Y.S. 2d at 863–864.

72. *Id.* at 864.

73. 458 S.W.2d 778 (Ky.1970).

74. Neither of the two published opinions in the case informs as to the time interval between the retirement of the property from service and its sale. Assuming, without deciding, that any appreciation in its value after retirement belonged to the utility investors, there would remain the question whether appreciation prior thereto would inure to the benefit of its customers.

75. By the agency's computation, the total net profit was $2,415,846, of which $138,791 was attributable to miscellaneous improvements on the land. The

latter portion of the profit invites the problem of allocation of capital gains on depreciable property. See Part II(A), *supra.* On judicial review of the agency's decision, City of Lexington v. Lexington Water Co., *supra* note 73, the court did not distinguish between the two portions of the $2,415,846.

76. Lexington Water Co., 72 P.U.R.3d 253 (Ky.Pub.Serv.Comm'n 1968).

77. On review of the decision, the court stated that there was a dispute as to whether the land had been acquired by condemnation or the threat thereof. 458 S.W.2d at 778. The court was of the opinion, however, that "whether the property was acquired by threats of use of the power of eminent domain [is] irrelevant." *Id.* at 779.

change in service value cannot be determined until actual disposition of the property, amortization of an allowable loss or gain would be the proper procedure. . . . If it is proper to recover losses of nondepreciable property through amortization, then conversely it should be proper to amortize gains on such property.[78]

On review, however, it was held that the agency's ruling was erroneous. The court distinguished *New York Water Service Corporation*[79] on the ground of a difference in the accounting methods respectively employed by New York and Kentucky regulatory authorities.[80] The Kentucky agency had adopted a system of accounts providing for the charging of losses and for the crediting of profits on land sales, not to customers, but rather to the utility's surplus account.[81] On that premise, the court apparently believed that the risk of capital gain or loss had actually been borne entirely by the utility's investors. On so much of the case, the court would seemingly have sustained the agency had the risk been on the utility's consumers.[82]

In the only other reported decision we have found, the problem was presented only obliquely. In Columbus Gas & Fuel Company v. Public Utilities Commission,[83] the utility claimed that its annual depreciation allowance for depreciable property other than well-structures and equipment was inadequate because some items, consisting in land and rights of way, had been omitted from the computation.[84] The Court denied the claim but in doing so indicated that under different conditions the claim might well have been valid.[85] In relevant part the Court said:

> Certainly lands and rights of way may not be characterized as wasting assets in the absence of explanation that would stamp that quality upon them. In saying this we do not forget that an abandonment of the business might bring about a sharp reduction in the value of the plant, aside from well-structures and equipment. There is nothing to show, however, that any such abandonment is planned or even reasonably probable. On the contrary, the course of business makes it clear

78. Lexington Water Co., *supra* note 76, 72 P.U.R.3d at 259–260.

79. *Supra* note 69.

80. For the New York practice, see text *supra* at note 72.

81. 458 S.W.2d at 779.

82. The court, however, also relied upon a passage in Board of Pub. Util. Comm'rs v. New York Tel. Co., 271 U.S. 23, 32, 46 S.Ct. 363, 366, 70 L.Ed. 808 (1926):
 Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company.
 And from that the Court further concluded that "[p]rofit made from the sale of non-depreciable land no longer used in serving customers is not an ingredient to be considered in fixing rates. The customers had no interest in the profit realized on the sale—it belonged to the

stockholder" 458 S.W.2d at 780. In our view, *New York Telephone Company* hardly sustains that proposition. There the Supreme Court addressed the question whether consumers could benefit from excessive depreciation, taken by a utility in prior years, through an offset that would produce lower future rates. 271 U.S. at 26–31, 46 S.Ct. 363. The Court held that the assets representing the excess in the reserve for depreciation could not be used to make up a deficiency in current rates which rendered them confiscatory. *Id.* at 32, 46 S.Ct. 363. As the Court said, consumers do not acquire an interest in utility assets merely by paying their bills for service. *Id.* at 32, 46 S.Ct. 363. That is not to say that the utility's investors have an indefeasibly vested right to gains arising from the appreciated market value of capital assets. See discussion in Part III, *infra*.

83. 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327 (1934).

84. *Id.* at 410–411, 54 S.Ct. 763.

85. *Id.* at 411, 54 S.Ct. at 769.

that, when the fields in use shall be exhausted, the business will extend to others, and this for an indefinite future, or certainly a future not susceptible of accurate estimation.[86]

As the Court indicated, a loss on the investment in nondepreciable elements of the utility's plant resulting from an unavoidable abandonment of its business would have been recognized if it had occurred, and that loss would then have been chargeable to its consumers.[87] One might easily reason from this premise that an appreciation in value of the nondepreciable elements would likewise become cognizable, and properly would redound to the benefit of the consumers.

In sum, the decisions outside the District have not viewed capital gains on in-service nondepreciable utility assets as inevitably belonging to investors to the exclusion of consumers. Rather, in each of the cases—although they are few—the allocation has depended upon location of the risk of loss. These holdings, then, may be accepted as applications of the broader principle that the benefit of a capital gain follows the risk of capital loss.[88] So read, they have our approbation.

—*District Cases*

The allocation properly to be made of in-service appreciations in value of Transit's nondepreciable assets is an open question in this jurisdiction. Although both the Commission and PUC, its predecessor in transit regulation, have occasionally spoken to the subject, this court has never before been called upon to face the issue. Our analysis of the administrative decisions—which have uniformly viewed such gains as belonging to Transit's investors—discloses that they leave a great deal to be desired.

In early 1959, as we have related, Transit received $3,320,000 from the sale of its Fourth Street Shops and Southern Carhouse to the District of Columbia Redevelopment Land Agency.[89] Of a total net profit on the transaction of $2,181,363.08,[90] $950,568.55 was attributable to land.[91] In D.C. Transit System, Inc. (Order No. 4577),[92] PUC resolved a dispute between Transit and PUC's staff as to the accounting treatment to be accorded the capital gain on the *depreciable* subject matter of the sale. At the outset, however, PUC declared that it could "dispose of one item not in controversy."[93] It did, thusly:

> The staff and the company are in agreement that under public utility accounting, the difference between the original cost of land and the selling price is recognized as profit. The net profit of $950,568.55 on the sale of the land (net proceeds of $1,039,657.72 less original cost of $89,089.17) is, therefore, a proper credit to earned surplus.[94]

We readily understand that the $950,-568.55, as PUC held, was net profit traceable to sale of the land. We are not nearly so clear, however, as to why PUC was confident that it was "therefore a proper credit to earned surplus." In other words, PUC does not tell us why it felt that the profit automatically belonged to investors. It may be that since the treatment to be given it was "not in controversy," [95] PUC deemed it a simple, indubitable accounting problem. In any event, we are left with our doubts.

86. *Id.*

87. See Part IV(A), *infra*, at notes 211–218.

88. See Part IV(A), *infra*, at notes 181–190.

89. See Part II(A), *supra* at notes 33–55.

90. See Part II(A), *supra* at note 35.

91. See note 36, *supra*.

92. *Supra* note 33.

93. 30 P.U.R.3d at 409.

94. *Id.*

95. Since the only party to the proceeding was Transit, no such "controversy" was likely unless generated by the Commission itself.

Order No. 4577 was later to come under judicial review by this court, but not in the aspect just discussed. By suit brought in the District Court for the District of Columbia, Transit attacked PUC's disposition of the profits allocable to the *depreciable* portion of the property sold.[96] Losing in that effort, Transit applied to this court, which affirmed.[97] Our action, of course, did not encompass PUC's ruling as to the gain realized on the land, for that ruling, favorable to Transit, was not brought before us. Still later, in D. C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission,[98] the sale of the same property was given attention by this court but, again, only in reference to the administrative disposition of the profits on the *depreciable* part.[99]

In D.C. Transit System, Inc. (Order No. 245),[100] the only other relevant decision in this jurisdiction, it was argued to the respondent Commission, without avail, that Transit's losses on the premature retirement of rail facilities[101]— which the Commission has passed on to Transit's farepayers[102]—might be offset by gains which Transit realized upon the sale of certain real estate.[103] The properties sold were, again Transit's Fourth Street Shops and Southern

Carhouse[104] and its Georgia and Eastern Terminal.[105] From aught that appears, nothing more than allocation of the net profit attributable to the *depreciable* portion of these properties was placed in issue before the Commission, and surely the decision on our review was that narrowly limited.[106] The Commission had, nevertheless, ventured a statement on the question as to which we are now analyzing the precedents. The Commission believed that "[i]t is a cardinal principle of regulatory law that a utility is not entitled to recover through depreciation charges or other accounting devices its investment in land."[107] "This principle," the Commission continued, "stems from the fact that in some instances the value of land appreciates and in other instances depreciates."[108] So, the Commission said "[w]hile the ratepayers have a claim to depreciable property, at least to the extent of the depreciation reserves, no such claim can be directed to land."[109]

We are unable to follow this course of reasoning. With a paucity of holdings, administrative or judicial, on the point, we have not detected a hard-and-fast rule one way or the other.[110] Nor can we understand how the economic fact that land values may trend upward or downward can support the position on

---

96. See Part II(A), *supra*, at note 55.

97. D.C. Transit System, Inc. v. Public Utils. Comm'n, *supra* note 51.

98. *Supra* note 18.

99. See 121 U.S.App.D.C. at 396–397, 350 F.2d at 774–775. See also the discussion in Part II(A), *supra*, at notes 52–55.

100. *Supra* note 18.

101. These were facilities acquired by Transit from its predecessor, Capital Transit Company. Transit's franchise required that it convert to an all-bus operation, see notes 42, *supra*, and 237, *infra*, and accompanying text, and in the process the facilities in question became obsolete. See the discussion in Part IV(B), *infra*, at notes 277–300.

102. See Part IV(B), *infra*, at notes 243–244.

103. 48 P.U.R.3d at 403–404.

104. See Part II(A), *supra*, at notes 33–35, and this Part, *supra*, at notes 89–99.

105. See Part II(A), *supra*, at notes 61–63.

106. See D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 18, 121 U.S.App.D.C. at 396–398, 350 F.2d at 774–776.

107. 48 P.U.R.3d at 399.

108. *Id.*

109. *Id.*

110. The Commission, like the Court in Lexington Water Company, see note 76, *supra*, felt that Board of Pub. Util. Comm'rs v. New York Tel. Co., *supra* note 82, "clearly resolves the issue raised in this case concerning the proceeds from nondepreciable property." 48 P.U.R.3d at 400. We think otherwise. See note 82, *supra*, and Part III, *infra*.

appreciation which the Commission assumed. The value of depreciable property, including depreciable improvements on land, also rises and falls with changing market conditions, and yet it is clear that consumers may contend for any capital gain achieved while it was used in service to the public.[111] What seeps through the Commission's discussion, however, is the conviction that the Commission has yet to consider factors which, at least in Transit's instance, bear importantly on the problem.

## III

### INTEREST OF INVESTORS IN VALUE-APPRECIATION IN OPERATING UTILITY ASSETS

█ We perceive no impediment, constitutional or otherwise, to recognition of a ratemaking principle enabling ratepayers to benefit from appreciations in value of utility properties accruing while in service. We believe the doctrinal consideration upon which pronouncements to the contrary [112] have primarily rested has lost all present-day vitality. Underlying these pronouncements is a basic legal and economic thesis—sometimes articulated, sometimes implicit—that utility assets, though dedicated to the public service, remain exclusively the property of the utility's investors, and that growth in value is an inseparable and inviolate incident of that property interest.[113] The precept of private ownership historically pervading our jurisprudence led naturally to such a thesis, and early decisions in the ratemaking field lent some support to it; if still

viable, it strengthens the investor's claim. We think, however, after careful exploration, that the foundations for that approach, and the conclusion it seemed to indicate, have long since eroded away.

### A. *In Rate Base Formulation*

Judicial indulgence in the concept that appreciation in value of utility property is an increment automatically attaching to its ownership reached its high water mark during the "fair value" era of rate-based formulations of returns to utilities.[114] In its 1898 decision in Smyth v. Ames,[115] the Supreme Court held "that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanctions must be the fair value of the property being used by it for the convenience of the public."[116] "[I]n order to ascertain that value," the Court said, "the original cost of construction, the amount expended in permanent improvements, . . . the present as compared with the original cost of construction, . . . are all matters for consideration, and are to be given such weight as may be just and right in each case."[117] And "[w]hat the company is entitled to ask," the Court continued, "is a fair return upon the value of land which it employs for the public convenience."[118]

Despite the Court's specification in Smyth v. Ames of original cost as well as reproduction cost as a factor to be considered in determining rate base value, the Court's decided preference during almost the next half-century was

---

111. See Part II(A), *supra*.

112. See D.C. Transit Sys., Inc. (Order No. 563), *supra* note 18, discussed in Part II(A), *supra*, at notes 60–64; D.C. Transit Sys., Inc. (Order No. 245), *supra* note 18, discussed in Part II(B), *supra*, at notes 100–111; D.C. Transit Sys., Inc. (Order No. 4577), *supra* note 33, discussed in Part II(A), *supra*, at notes 33–50; City of Lexington v. Lexington Water Co., *supra* note 73, discussed in Part II(B), *supra*, at notes 73–82.

113. See cases cited *supra* note 112.

114. See generally, 1 A. Priest, Principles of Public Utility Regulation 139 et seq. (1969) ; J. Bonbright, Principles of Public Utility Rates 159 et seq. (1961). To be distinguished is the operating ratio method of computing return. See note 266, *infra*, and accompanying text.

115. 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).

116. *Id.* at 546, 18 S.Ct. at 434.

117. *Id.* at 546–547, 18 S.Ct. at 434.

118. *Id.* at 547, 18 S.Ct. at 434.

a reproduction cost formula.[119] This meant, of course, that in times of rising prices, the use of reproduction cost to the exclusion of original cost advantaged the utility's investors and disadvantaged its consumers. In 1908, in Willcox v. Consolidated Gas Company,[120] the Court remarked that "[i]f the property which legally enters into consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase."[121] Five years later, in the *Minnesota Rate Cases*,[122] the Court observed that the utility's "property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law."[123] And as late as 1926, in Board of Public Utility Commissioners v. New York Telephone Company,[124] the Court stated that "[c]ustomers pay for service, not for the property used to render it . . . [b]y paying bills for service they do not acquire any interest, legal or equitable, in the property used for the convenience or in the funds of the company."[125] Expressions of this sort encourage the idea that investors were entitled to all the benefits of value-growth of utility assets, of which the base for their rate of return was only one.

The fair value theory, however, was not to survive as the inexorable standard for setting rate base. Perhaps the turning point in conceptualization of the rights of investors viz-a-viz consumers in utility property occurred in 1923. In that year, Justice Brandeis, in his celebrated separate opinion in *Southwestern Bell Telephone Company*,[126] rejected the fair value approach to ratemaking and advanced a new basic concept:

> The thing devoted by the investor to the public use is not specific property, tangible or intangible, but capital embarked in the enterprise. Upon the capital so invested the federal Constitution guarantees to the utility the opportunity to earn a fair return.[127]

Justice Brandeis' formula for ascertaining rate base—the amount of capital prudently invested—was not to become the prevailing rule.[128] But what has since prevailed is the central idea that the investor's legally protected interest resides in the capital he invests in the utility rather than in the items of property which that capital purchases for provision of utility service. In 1933, the Court sustained a rate base valuation

---

119. For application of the formula in various contexts, see West v. Chesapeake & Potomac Tel. Co., 295 U.S. 662, 671, 55 S.Ct. 894, 79 L.Ed. 1640 (1935); St. Louis & O'F Ry. v. United States, 279 U.S. 461, 487, 49 S.Ct. 384, 73 L.Ed. 798 (1929); McCardle v. Indianapolis Water Co., 272 U.S. 400, 408–409, 47 S.Ct. 144, 71 L.Ed. 316 (1926); Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n, 262 U.S. 276, 288, 43 S.Ct. 544, 67 L.Ed. 981 (1923); Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 354, 33 S.Ct. 729, 57 L.Ed. 1511 (1913); Willcox v. Consolidated Gas Co., 212 U.S. 19, 41, 52, 29 S.Ct. 192, 53 L. Ed. 382 (1909).

120. *Supra* note 119.

121. 212 U.S. at 52, 29 S.Ct. at 200.

122. *Supra* note 119.

123. 230 U.S. at 454, 33 S.Ct. at 762.

124. *Supra* note 82.

125. 271 U.S. at 32, 46 S.Ct. at 366.

126. *Supra* note 119, 262 U.S. at 289, 43 S.Ct. 544. Justice Holmes joined in the opinion.

127. *Id.* at 290, 43 S.Ct. at 547 (footnote omitted).

128. The prudent investment theory has, however, seen service in the District of Columbia. In Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 188 F.2d 11 (1950), cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951), where PUC had applied that theory in lieu of reproduction costs, *id.* at 123, 188 F.2d at 19, we pointed out that "[p]rimary emphasis is now being placed not on 'specific property, tangible and intangible,' but on capital prudently invested and embarked on an enterprise in the public service." *Id.* (footnote omitted).

from which reproduction cost had been excluded,[129] and five years later the Court upheld another valuation founded upon historical cost alone.[130] In 1942, in Federal Power Commission v. Natural Gas Pipeline Company,[131] the Court more formally abandoned reproduction cost when it ruled that "[t]he Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas."[132] Finally, in 1944, in Federal Power Commission v. Hope Natural Gas Company,[133] the Court rejected the Fourth Circuit's conclusion that the utility's rate base should reflect the "present fair value" of its property.[134] " '[F]air value,' " it said, "is the end product of the process of ratemaking not the starting point as the Circuit Court of Appeals held."[135] "Under [a] statutory standard of 'just and reasonable,' "[136] it added, "it is the result reached not the method employed which is controlling. . . . It is not theory but the impact of the rate order that counts."[137] This approach to rate base formulation is the prevailing doctrine today.[138]

■ The teaching of the modern cases in this area is plain. If investors in a public utility possessed an indefeasible right to the appreciation in value of the utility's operating assets, the base on which their rate of return is computed —the aggregate of the assets themselves —could be set only at the true value of the assets at the moment of setting. Fairness would suggest that result and due process would seem to compel it.[139] But it is now clear that the utility is not entitled of right to have its rate base established at the value which the assets would command on the current market, although that market value exceeds original cost. This can mean only that the investors' legally protected interest in such assets does not inexorably extend to the increment in value.

## B. *In Depreciation Base Formulation*

The rise and fall of fair value as the exclusive method of measuring utility rate base has been paralleled by judicial treatment of the interrelated problem of basis for depreciation of utility assets. An integral part of the process of establishing a rate base for purposes of rate of return is ascertainment of the amount to be deducted from rate base— and, of course, allowed as an operating expense—for depreciation [140] of the util-

129. Los Angeles Gas Co. v. Railroad Comm'n, 289 U.S. 287, 295–297, 53 S.Ct. 637, 77 L.Ed. 1180 (1933).

130. Railroad Comm'n v. Pacific Gas Co., 302 U.S. 388, 399, 405, 58 S.Ct. 334, 82 L.Ed. 319 (1938).

131. 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942).

132. *Id.* at 586, 62 S.Ct. at 743.

133. 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

134. See *Id.* at 599–600, 64 S.Ct. 281.

135. *Id.* at 601, 64 S.Ct. at 287. It seems clear that *Hope Natural Gas* thus adopted the investment concept which Justice Brandeis had espoused in *Southwestern Bell.* See text *supra* at note 127. See also 2 A. Priest, Principles of Public Utility Regulation 503–504 (1969).

136. The quoted language is from the Natural Gas Act of 1938, 52 Stat. 821 (1938), §§ 4(a), 5(a), 15 U.S.C. §§ 717c (a), 717d(a) (1970). The Commission is required to apply exactly the same standard in promulgating Transit's fares. Compact, *supra* note 12, tit. II, art. XII, § 6(a)(3).

137. 320 U.S. at 602, 64 S.Ct. at 287.

138. See, in addition to cases cited *supra*, FPC v. Natural Gas Pipeline Co., *supra* note 131, 315 U.S. at 586, 62 S.Ct. 736; Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), 390 U.S. 747, 800, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). As to the District of Columbia, see note 128, *supra*, and, as to the states, I A. Priest, Principles of Public Utility Regulation 142–66 (1969).

139. See, e. g., Minnesota Rate Cases (Simpson v. Shepard), *supra* note 119, 230 U.S. at 454, 33 S.Ct. 729, quoted in text *supra* at note 123.

140. See note 18, *supra*.

ity's in-service property.[141] And if appreciation in the value of utility property is to invariably inure to the benefit of investors, it would logically follow that allowances for depreciation must be computed on present value rather than acquisition cost or some other basis.

That was the view to which the Supreme Court originally subscribed. In 1909, in Knoxville v. Knoxville Water Company,[142] the Court decided that the utility "is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning."[143] "It is," the Court said, "not only the right of a company to make such a provision but it is its duty to its bond and stockholders, and, in the case of a public service corporation, at least, its plain duty to the public."[144] Two decades later, the Court, in United Railways and Electric Company v. West,[145] upheld a ruling that annual depreciation allowances were to be calculated on the basis of present value rather than cost.[146] Repeating the theme of *Knoxville Water Company*, a majority of the Court [147] referred to its then "settled rule" that rate base was to be established at present value,[148] and argued that "it would be wholly illogical to adopt a different rule for depreciation."[149]

Fair value, as the basis for depreciation, however, was later to go the way of fair value as the measure of rate base.[150] By 1934, in Lindheimer v. Illinois Bell Telephone Company,[151] the Court upheld the propriety of computing annual depreciation on original cost.[152] The Court pointed out that "if the amounts charged to operating expenses and credited to the account for depreciation reserve are excessive, to that extent subscribers for the telephone service are required to provide, in effect, capital contributions, not to make good losses incurred by the utility in the service rendered and thus to keep its investment unimpaired, but to secure additional plant and equipment upon which the utility expects a return."[153] And by 1942, in Federal Power Commission v. Natural Gas Pipeline Company,[154] the Court has sustained an amortization basis for depletable utility property calculated on capital investment rather than reproduction cost.[155] There the Court stated:

> When the property is devoted to a business which can exist only for a limited term, any scheme of amortization which will restore the capital investment at the end of the term involves no deprivation of property. Even though the reproduction cost of the property during the period may be more than its actual cost, this theoretical accretion to value represents no profit to the owner, since the property dedicated to the business, save for its salvage, is destined for the scrapheap

141. "Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered." Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 167, 54 S.Ct. 658, 665, 78 L.Ed. 1182 (1934) (footnote omitted).

142. 212 U.S. 1, 29 S.Ct. 148, 53 L.Ed. 371 (1909).

143. *Id.* at 13–14, 29 S.Ct. at 152.

144. *Id.* at 14, 29 S.Ct. at 152.

145. 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390 (1930).

146. *Id.* at 253–254, 50 S.Ct. 123.

147. Justice Brandeis, with whom Justice Holmes concurred, dissented. 280 U.S. at 254, 50 S.Ct. 123.

148. See Part III(A), *supra.*

149. 280 U.S. at 254, 50 S.Ct. at 126.

150. See Part III(A), *supra.*

151. *Supra* note 141.

152. 292 U.S. at 168–169, 54 S.Ct. 658.

153. *Id.* at 169, 54 S.Ct. at 665.

154. *Supra* note 131.

155. 315 U.S. at 592–593, 62 S.Ct. 736.

when the business ends. The Constitution does not require that the owner who embarks in a wasting-asset business of limited life shall receive at the end more than he has put into it.[156] Finally, in Federal Power Commission v. Hope Natural Gas Company,[157] in 1944, the Court upheld depreciation and depletion allowances based on cost,[158] overruling United Railways and Electric Company v. West in the process.[159] "By such a procedure," said the Court, "the utility is made whole and the integrity of its investment maintained. No more is required."[160]

■ Here again we draw a lesson from the jural history of ratemaking. Investors are entitled to recover the utility's outlay in the assets employed in provision of the utility's public service.[161] If the investors' protected interest in those assets encompassed increases in their market value, it would necessarily follow that the recoupment must embrace the increases as well as the amount laid out for their acquisition. But it is now clear that the amount of eventual recovery—the depreciation base —may permissibly be limited to the amount of the original outlay. This is but another way of saying that the investors do not possess a vested right in value-appreciations accruing to in-service utility assets.

C. *In Transit's Ratemaking Litigation*

The considerations just explored take on added weight in Transit's case, for fair value has never been assigned a role in determinations as to its rate or depreciation bases. That it was not an ingredient of either was settled rather early in Transit's regulatory history. In the days prior to utilization of the operating ratio method in computations of its margins of return,[162] the Commission's predecessor, PUC, established and maintained Transit's rate base without consideration of the then present value of its in-service properties.[163] In those days, PUC also employed original cost as the formula for setting Transit's depreciation base,[164] and the Commission in its turn, has done the same.[165] Neither for purposes of its rate base nor its basis for depreciation, then, has appreciation in the market value of its assets been deemed a benefit to which Transit's investors might justly lay claim.

But that was not because the effort was not made. In a fare-increase proceeding inaugurated in 1960, Transit sought to persuade PUC to adopt a depreciation base combining replacement cost for some properties with market value for others.[166] PUC, however, declined to do so.[167] Instead, PUC pointed out that it has "long held that original cost is the only sound basis for measuring depreciation as it is in accord with the fundamental purpose of depreciation accounting, namely, to recover the cost of investment rather than to provide for the cost of replacement."[168] "The use of replacement cost as a base for the calculation of depreciation allowances,"

156. *Id.* at 593, 62 S.Ct. at 746.

157. *Supra* note 133.

158. 320 U.S. at 606, 64 S.Ct. 281.

159. *Id.* at 606–607, 64 S.Ct. 281.

160. *Id.* at 606, 64 S.Ct. at 289.

161. See text *supra* at notes 142–144.

162. See note 266, *infra*.

163. See note 266, *infra*.

164. See D. C. Transit Sys., Inc. (Order No. 4631), 33 P.U.R.3d 137, 155 (D. C. Pub. Utils. Comm'n 1960), wherein PUC established Transit's acquisition adjustment account, discussed in text *infra* at notes 251–256, a device which incorporated original cost rather than present value as the basis for depreciation. See also D. C. Transit Sys., Inc. (Order No. 4735), 38 P.U.R.3d 19, 34–35 (D. C. Pub. Utils. Comm'n 1961) (rejecting replacement cost), discussed in text *infra* at notes 167–170.

165. See, *e. g.*, D. C. Transit Sys., Inc. (Order No. 984), 81 P.U.R.3d 417, 427 (WMATC 1969).

166. D. C. Transit Sys., Inc. (Order No. 4735), *supra* note 164, 38 P.U.R.3d at 34.

167. *Id.* at 34–35.

168. *Id.* at 34.

in PUC's view, "has many serious faults," [169] not the least of which is the distinct possibility that Transit's fare-payers would thereby be made involuntary contributors to its capital. PUC explained:

> [I]f prices are rising the use of the replacement cost base would compel consumers to provide additional capital for the utility, at least to the extent that replacement costs were greater than the costs of the depreciating equipment. [Transit's witness] admitted that under his theory consumers would be in the position of involuntary investors though with no right to a return on their investment; and what is even worse, they would thereafter be required to provide a fair return and depreciation allowance on capital which they themselves had contributed. Obviously, consumers' obligations end when they have paid the cost of service including the cost of the depreciable assets used and exhausted in rendering that service. The original cost base is just and equitable for both investors and consumers. Consumers pay the cost of service including the cost of capital. To ask the consumers to pay more than the cost is to make them contribute to the capital of the enterprise.[170]

■ We cannot, then, accept the thesis that appreciations in value of Transit's properties while in operating status automatically flow to Transit's investors as inseparable incidents of ownership. To be sure, investors are entitled to have rates fixed with a view to a fair return on their investment,[171] and to

have depreciation allowances set in contemplation of eventual recoupment of their investment in toto.[172] But modern ratemaking doctrine militates against the proposition that value-appreciation alone can legitimately increase either the return[173] or the recoupment.[174] Indeed in Transit's case it never has,[175] and that would have been legally impossible if the investors' protected interest in Transit's assets extended to advances in market value as well as to the original investment in them. The fact is that Transit's investors have been so limited in both respects, and that serves adequately to refute any notion that they necessarily possess a claim on such advances.[176]

## IV

## BASIS FOR ALLOCATION OF CAPITAL GAINS ON OPERATING UTILITY ASSETS

■ Investors, we have concluded, are not automatically entitled to gains in value of operating utility properties simply as an incident of the ownership conferred by their investments. And it goes without saying that consumers do not succeed to such gains simply because they are users of the service furnished by the utility. Neither capital investment nor service consumption contributes in any special way to value-growth in utility assets. Rather, the values with which we are concerned have grown simply because of a rising market.

Investors and consumers thus start off on an equal footing, and the disposi-

---

169. *Id.*

170. *Id.* at 34–35.

171. D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 151 U.S.App.D.C. 223, 247–248, 466 F.2d 394, 418–419, cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).

172. See Part III(A), *supra.*

173. See Part III(B), *supra.*

174. See Part III(B), *supra.*

175. See text *supra* at notes 162–170.

176. Indeed, claims of utility investors, including Transit's, on appreciations in value of depreciable utility assets have generally been subordinated to the claims of the utility's consumers. See Part II(A), *supra.* That, we believe, is a consequence, rather than a cause, of the investors' lack of an indefeasible right to the appreciations. But it is evident that consumers could never have enjoyed priority, or even a measure of equality, if the investors' right were absolute.

tion of the growth must depend on other factors. We thus reach the dual critical inquiry: identification of the principles which must guide the allocation, as between investor and consumer groups, of appreciation in value of utility assets while in operating status; and application of those principles to Transit's situation.

## A. Doctrinal Considerations

The ratemaking process involves fundamentally "a balancing of the investor and the consumer interests."[177] The investor's interest lies in the integrity of his investment and a fair opportunity for a reasonable return thereon.[178] The consumer's interest lies in governmental protection against unreasonable charges for the monopolistic service to which he subscribes.[179] In terms of property value appreciations, the balance is best struck at the point at which the interests of both groups receive maximum accommodation. We think two accepted principles which have served comparably to effect satisfactory adjustments in other aspects of ratemaking can do equal service here.

One is the principle that the right to capital gains on utility assets is tied to the risk of capital losses. The other is the principle that he who bears the financial burden of particular utility activity should also reap the benefit resulting therefrom. The justice inherent in these principles is self-evident, and each already occupies a niche in the law of ratemaking;[180] and their application, sometimes overlapping, to the problem at hand weighs the scale heavily in favor of consumers. For practice in the utility field has long imposed upon consumers substantial risks of loss and financial burden associated with the assets employed in the utility's business. We will pause to examine the practices, and then their effect in conjunction with the principles mentioned.

### —Right to Gain Follows Risk of Loss

A factor strongly influencing the rate of return to which the utility investor becomes entitled is the magnitude of the risk which his investment encounters.[181] High risks justify larger returns,[182] while low risks more nearly guarantee the investment, and so may warrant smaller returns.[183] Similarly, an investor can hardly muster any equitable support for a claim to appreciation in asset value where he has been shielded against the risk of loss on his investment, or has already been rewarded for taking on that risk.

The proposition that capital gain rightly inures to the benefit of him who bore the risk of capital loss has been ac-

177. FPC v. Hope Natural Gas Co., supra note 133, 320 U.S. at 603, 64 S.Ct. at 288.

178. E. g., id.

179. "[F]rom the earliest cases, the end of public utility regulation has been recognized to be protection of consumers from exorbitant rates." Washington Gas Light Co. v. Baker, supra note 128, 88 U.S.App.D.C. at 119, 188 F.2d at 15 (footnote omitted).

180. See discussion in Part IV(A), infra.

181. See, e. g., FPC v. Hope Natural Gas Co., supra note 133, 320 U.S. at 605, 64 S.Ct. 281; Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 160–162, 51 S.Ct. 65, 75 L. Ed. 255 (1930); United Rys. & Elec. Co. v. West, supra note 145, 280 U.S. at 249, 250, 50 S.Ct. 123; Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n, 262 U.S. 679, 692–693, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); Williams v. Washington Metropolitan Area Transit Comm'n, supra note 16, 134 U.S.App.D.C. at 355 nn. 64, 65, 415 F.2d at 935 nn. 64, 65.

182. See Atlantic Ref. Co. v. FPC, 115 U.S.App.D.C. 26, 28, 316 F.2d 677, 679 (1963); New Haven Water Co., 2 P.U. R.3d 452, 456–60 (Conn. Pub. Utils. Comm'n 1954). See also cases cited supra note 181.

183. FPC v. Hope Natural Gas Co., supra note 133, 320 U.S. at 604–605, 64 S.Ct. 281; State ex rel. Pacific Tel. & Tel. Co. v. Department of Pub. Serv., 19 Wash. 2d 200, 142 P.2d 498, 528 (en banc 1943); Michigan Bell Tel. Co. v. Public Serv. Comm'n, 332 Mich. 7, 50 N.W.2d 826, 840–841 (1952); El Paso Natural Gas Co., 28 F.P.C. 688, 694–95, 45 P.U.R.3d 262, 270–71 (1962).

cepted in ratemaking law. Thus, as we have seen, investors have been denied capital gains realized on disposition of utility assets where they have not borne the risk of loss associated with the holding of such assets.[184] And we have consistently held that investors cannot recover for under-depreciated assets where they have in some form been compensated either for the deficiency or for assuming the risk that a deficiency might occur.[185] On the other hand, grave risks associated with utility assets are commonly thrust upon consumers. Many are susceptible to loss or damage from acts of nature and man, and risks of such casualties are usually passed on to consumers.[186] The risk of loss from premature retirement of assets because of obsolescence, as a general rule, also falls on consumers.[187] Moreover, in at least one jurisdiction, the possibility that a utility asset will diminish in market value while in service is a hazard which the consumer rather than the investor must face.[188] And, unlike casualty losses, those resulting from obsolescence and declining markets may occur with respect to nondepreciable as well as depreciable assets.[189] Some cases have already awarded value appreciations to consumers in such situations.[190]

In our view, the doctrine that capital gain accompanies the risk of capital loss is sound. The following example illustrates how this principle applies to land, which, while it may have lost its usefulness in a utility's operations, has nonetheless appreciated in value while in operating status. Let us suppose that fifteen years ago the company purchased a piece of property on which to construct a building to be used as its central offices. Under established principles of regulatory law, the loss from normal wear and tear on the building—a depreciable asset—would be recouped from its ratepayers by the investors, who are entitled to have their investment in an operating asset protected.[191] What would happen if, because of a change in the character of the neighborhood or because of a need for increased office space, the building were no longer suitable for the utility's operations? If the building had to be sold at a loss, clearly the ratepayers, under the precepts articulated above, would bear the burden of covering that loss.[192] On the other hand, if a profit were made on the sale of the building, the gain would go to the ratepayers, at least to the extent necessary to recoup their payments for depreciation.[193]

As for the land on which the building is located, it is true that land does not depreciate from ordinary wear and tear the way a building does. But it is also

184. See cases discussed *supra* in Part II (A).

185. Bebchick v. Public Utilities Comm., 115 U.S.App.D.C. 216, 224, 318 F.2d 187, 195, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 374–376, 415 F.2d at 954–956; Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 123–125, 188 F.2d at 19–21. See also Minneapolis St. Ry. Co. v. City of Minneapolis, 251 Minn. 43, 86 N.W.2d 657, 665–668 (1957).

186. See, Northwestern Bell Tel. Co., 78 S.D. 15, 98 N.W.2d 170, 179 (1959); Diamond State Tel. Co., 28 P.U.R.3d 121, 137–39 (Del. Pub. Serv. Comm'n 1959); Baltimore Gas & Elec. Co., 25 P.U.R.3d 91 (Md. Pub. Serv. Comm'n 1959); Florida Power & Light Co., 19 P.U.R.3d 417, 429 (Fla. R. R. & Pub. Util. Comm'n 1957); Long Island Lighting Co., 7 P.U. R.3d 140, 141–42 (N. Y. Pub. Serv. Comm'n 1955).

187. See text *infra* at note 201.

188. See New York Water Serv. Corp. v. Public Serv. Comm'n, *supra* note 69, discussed in Part II(B), *supra*, at notes 69–72.

189. See *id.*; Columbus Gas & Fuel Co. v. Public Serv. Comm'n, *supra* note 83, 292 U.S. at 411, 54 S.Ct. 763.

190. See cases discussed in Part II(B), *supra*.

191. See Part IV(A), *infra*, at note 199.

192. See Part IV(A), *infra*, at notes 211–218.

193. See Part II(A), *supra*; Part IV(A), *infra*, at notes 225–227.

true that the land in our example has become unsuitable—in business parlance obsolete—for continued use in the company's operations. If it, like the building, must be retired from service and sold at a loss, who bears the onus of making up that loss? Since the investors may insist upon preservation of any investment they make in an asset to be used in the utility's operations, it is the ratepayers' burden to compensate them for the loss on their investment in the land.[194] Accordingly, if the land no longer useful in utility operations is sold at a profit, those who shouldered the risk of loss are entitled to benefit from the gain.[195]

The principle that capital gain follows risk of loss, useful as it may be, is not without its limitations. There may be situations where the assignment of risk of loss on a particular asset is not readily ascertainable, or where for some other reason the terminology "capital gains and losses" is inappropriate or inapposite.[196] In such a case the second doctrinal consideration we have mentioned—the precept that those who bear the financial burden of particular utility activity should also reap the benefit resulting therefrom—comes into play.

### —Economic Benefit Follows Economic Burden

Ratepayers bear the expense of depreciation, including obsolescence and depletion, [197] on operating utility assets through expense allowances to the utilities they patronize.[198] It is well settled that utility investors are entitled to recoup from consumers the full amount of their investment in depreciable assets devoted to public service.[199] This entitlement extends, not only to reductions in investment attributable to physical wear and tear (ordinary depreciation) [200] but also to those occasioned by functional deterioration (obsolescence) [201] and by

194. See Part IV(A), *infra*, at notes 211–218.

195. See Part II(B), *supra*.

196. See Part IV(B), *infra*, at notes 228–229.

197. For definitions, see note 18, *supra*.

198. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 65–67, 56 S.Ct. 720, 80 L.Ed. 1033 (1936) ; Lindheimer v. Illinois Bell Tel. Co., *supra* note 141, 292 U.S. at 165–175, 54 S.Ct. 658 ; Pacific Gas & Elec. Co. v. City & County of San Francisco, 265 U.S. 403, 415–416, 44 S.Ct. 537, 68 L.Ed. 1075 (1924) ; Kansas City S. Ry. v. United States, 231 U.S. 423, 449–452, 34 S.Ct. 125, 58 L.Ed. 296 (1913) ; Minnesota Rate Cases (Simpson v. Shepard), *supra* note 119, 230 U.S. at 456–458, 33 S.Ct. 729 ; Knoxville v. Knoxville Water Co., *supra*, note 142, 212 U.S. at 9–11, 29 S.Ct. 148 ; D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 18, 121 U.S.App.D.C. at 394–395, 350 F.2d at 772–773 ; Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 123, 188 F.2d at 19 ; FPC v. Hope Natural Gas Co., *supra* note 133, 320 U.S. at 605, 64 S.Ct. 281. See also the cases cited *infra* notes 201–202.

199. FPC v. Hope Natural Gas Co., *supra* note 133, 320 U.S. at 596–607, 64 S.Ct.

281; United Rys. & Elec. Co. v. West, *supra* note 145, 280 U.S. at 253–254, 50 S.Ct. 123 ; Illinois Cent. R. R. v. ICC, 206 U.S. 441, 461–463, 27 S.Ct. 700, 51 L.Ed. 1128 (1907) ; Smyth v. Ames, *supra* note 115, 169 U.S. at 547, 18 S.Ct. 418 ; D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 18, 121 U.S.App.D.C. at 394–395, 350 F.2d at 772–773 ; Panhandle Eastern Pipe Line Co. v. FPC, 113 U.S. App.D.C. 94, 305 F.2d 763 (1962), cert. denied, 372 U.S. 916, 83 S.Ct. 719, 9 L. Ed.2d 722 (1963) ; City of Detroit v. FPC, 97 U.S.App.D.C. 260, 263, 230 F.2d 810, 813 (1955), cert. denied, 352 U.S. 829, 77 S.Ct. 37, 1 L.Ed.2d 48 (1956) ; Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 119–120, 122–123, 188 F.2d at 15–16, 18–19 ; Public Utils. Comm'n v. Capital Traction Co., 57 App.D.C. 85, 88, 17 F.2d 673, 676 (1927) ; Safe Harbor Water Power Corp. v. FPC, 179 F.2d 179, 193–199 (3d Cir. 1949), cert. denied, 339 U.S. 957, 70 S.Ct. 980, 94 L.Ed. 1368 (1950) ; City of Minneapolis v. Rand, 285 F. 818, 825–831 (8th Cir. 1923).

200. See cases cited *supra* note 198.

201. E. g., Los Angeles Gas & Elec. Corp. v. Railroad Comm'n, *supra* note 129, 289 U.S. at 306–307, 53 S.Ct. 637 ; Pacific Gas & Elec. Co. v. City & County of San

exhaustion (depletion).[202] Recoupment of investment, particularly where the reduction is gradual, is usually accomplished by annual or other periodic allowances, commonly referred to as depreciation expenses.[203] Recoupment may, however, be effected by a single charge, or by amortization of the investment loss against the ratepayers, as is more frequently done in instances of obsolescence and resulting abandonment of still, serviceable assets.[204] In all cases, the expense levied against ratepayers is the difference between the original cost of the asset and its salvage value,[205] estimated or actual.[206]

Computations of the cost of ordinary depreciation—normal physical deterioration—are made on the basis of estimates of service life and salvage value, and charges therefor are usually spread over the service period.[207] Depletion allowances are similarly based on estimates of productive life, and usually are similarly spread.[208] Even obsolescence may sometimes be foreseen and calculated in much the same manner.[209] It is evident that if all predictions are accurate and the asset remains in service for precisely the period anticipated, the process will eventually yield to investors the exact amount of their investment, and will ultimately cost consumers the same amount. Consumers will thus absorb the investment loss and investors will be made whole.

But calculations, even of the highest predictive quality, sometimes go awry. Service life, productive life or salvage value may turn out to be more or less than originally estimated.[210] Obsolescence may be slower or faster than ex-

Francisco, *supra* note 198, 265 U.S. at 406–416, 44 S.Ct. 537; Kansas City S. Ry. v. United States, *supra* note 198; Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 126, 188 F. 2d at 22; Colorado Interstate Gas Co. v. FPC, 142 F.2d 943, 959–961 (10th Cir. 1944); Minneapolis St. Ry. v. City of Minneapolis, *supra* note 185, 86 N.W.2d at 665–668.

202. *E. g.*, FPC v. Hope Natural Gas Co., *supra* note 133, 320 U.S. at 606 et seq., 64 S.Ct. 281; Dayton Power & Light Co. v. Public Serv. Comm'n, 292 U.S. 290, 303–305, 54 S.Ct. 647, 78 L.Ed. 1267 (1934); Arkansas-Louisiana Gas Co. v. City of Texarkana, 17 F.Supp. 447, 460–463 (W.D.Ark.1936).

203. See cases cited *supra* notes 199, 201, 202.

204. Consolidated Edison, 56 P.U.R.3d 337, 371–77 (N. Y. Pub. Serv. Comm'n 1964) (losses incurred in retirement of plant amortized); Lakewood Water Co., 78 P.U.R.3d 453, 457, 458 (N. J. Bd. of Pub. Util. Comm'rs 1968); Missouri Cities Water Co., 53 P.U.R.3d 352, 354, 359–60 (Mo. Pub. Serv. Comm'n 1965) (plant with life expectancy of 50 years retired because of increasing saline content after only six years of operation amortized over 10-year period); Howes v. Mather Water Co., 13 P.U.R.3d 486, 490–91 (Pa. Pub. Util. Comm'n 1956) (supply sources abandoned because of contamination amortized). See

generally, Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 123–127, 188 F.2d at 19–23.

205. See cases cited *supra* note 198.

206. See cases cited *supra* notes 198, 199, 201, 204.

207. As to the "service life theory of depreciation," see particularly International Ry. v. Prendergast, 1 F.Supp. 623, 627–631 (W.D.N.Y.1932). See also cases cited *supra* note 204. Compare 1 A. Priest, Principles of Public Utility Regulation 117–24 (1969). In D. C. Transit Sys., Inc. (Order No. 4735), *supra* note 164, 38 P.U.R.3d at 35, the straight-line method of depreciation accounting, as opposed to the sum-of-digits method, was approved for ratemaking purposes.

208. See cases cited *supra* note 202.

209. See cases cited *supra* notes 201–204.

210. See St. Joseph Stock Yards Co. v. United States, *supra* note 198, 298 U.S. at 55–72, 56 S.Ct. 720; Lindheimer v. Illinois Bell Tel. Co., *supra* note 141, 292 U.S. at 168–175, 54 S.Ct. 658; Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S. App.D.C. at 371–376, 415 F.2d at 951–956; Bebchick v. Public Utils. Comm'n, *supra* note 185, 115 U.S.App.D.C. at 223–224, 318 F.2d at 194–195; California-Pacific Utils. Co., 71 P.U.R.3d 270, 272 (Nev.Pub.Serv.Comm'n 1967).

pected in the beginning,[211] or may arrive suddenly,[212] and damage to or destruction of the asset may occur just as suddenly.[213] In most instances, however, the consumers' financial obligation remains intact, the investors' right to recoupment remains unimpaired, and appropriate adjustments must be made.[214] This is so although in terms of original expectations, the loss of serviceability is premature.[215] Consumers bear the risk of that loss [216] unless investors have been compensated for assuming it; [217] if, as is more usual, investors have not, return of their investment is fully assured.[218]

 In this milieu, the distribution of the risks and burdens on utility assets is apparent. Consumers must or-

dinarily bear the expense of normal maintenance [219] and, according to some decisions, of deferred maintenance as well.[220] Beyond that, consumers must usually absorb the investment losses wrought by normal wear and tear on depreciable assets,[221] and by exhaustion of depletable assets.[222] Even when an asset is underdepreciated at the time it is retired from service, consumers must reimburse the investors therefor.[223] And when utility property becomes unsuitable by reason of obsolescence before investors have fully recouped their investment in it, the loss is passed on to consumers.[224]

 In situations where consumers have shouldered these burdens on an asset which produces a gain, the equities clearly preponderate in their favor.

---

211. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 372–376, 415 F.2d at 952–956; D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 18, 121 U.S.App.D.C. at 390–391, 350 F.2d at 768–769; D. C. Transit Sys., Inc. (Order No. 952), 80 P.U.R.3d 1 (WMATC 1969); Maui Elec. Co., 74 P.U.R.3d 140, 147–50 (Hawaii Pub. Util. Comm'n 1968); Honolulu Rapid Transit Co., 68 P.U.R.3d 409, 414 (Hawaii Pub.Serv.Comm'n 1967). Compare D. C. Transit Sys., Inc. (Order No. 245), *supra* note 18, 48 P.U.R.3d at 405, 406 (allowing reduction in service-life period).

212. *E. g.*, see cases cited *supra* note 204.

213. *E. g.*, Missouri Cities Water Co. and Howes v. Mather Water Co., both *supra* note 204.

214. *E. g.*, William v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 374–378, 415 F.2d at 954–958.

215. See cases cited *supra* notes 211–213.

216. See FPC v. Hope Natural Gas Co., *supra* note 133, 320 U.S. at 603, 64 S.Ct. 281; Bluefield Water Works & Improvement Co. v. Public Service Comm'n, *supra* note 181, 262 U.S. at 692–693, 43 S.Ct. 675. *Accord*, Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), *supra* note 138, 390 U.S. at 792, 88 S.Ct. 1344; Atlantic Ref. Co. v. FPC, *supra* note 182, 115 U.S.App.D.C. at 27–28, 316 F.2d at 678–679.

217. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 374–377, 415 F.2d at 954–957; D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 18, 121 U.S.App. D.C. at 394–395, 350 F.2d at 772–773, aff'g after remand in Bebchick v. Public Service Comm'n, *supra* note 185, 115 U.S. App.D.C. at 224, 318 F.2d at 195; Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 123–124, 188 F.2d at 19–20.

218. See cases cited *supra* note 217.

219. In re Northwestern Bell Tel. Co., 73 S.D. 37, 43 N.W.2d 553, 564 (1950), cert. denied, 340 U.S. 934, 71 S.Ct. 489, 95 L.Ed. 674 (1951); D. C. Transit Sys., Inc. (Order No. 564), 63 P.U.R.3d 45, 55 (WMATC 1966); Cheyenne Light, Fuel & Power Co., 7 P.U.R.3d 129, 134 (Wyo.Pub.Serv.Comm'n 1955).

220. *E. g.*, Wall v. Public Util. Comm'n, 182 Pa.Super. 35, 125 A.2d 630, 638–639 (1956); Penn-York Natural Gas Co., 5 F.P.C. 33, 37, 63 P.U.R. (n.s.) 235, 238 (1946); Lucerne Water Co., 52 P.U.R.3d 219, 224–25 (Cal.Pub.Util.Comm'n 1964).

221. See cases cited *supra* note 198.

222. See cases cited *supra* note 202.

223. Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 123–124, 188 F.2d at 19–20; Minneapolis St. Ry. v. City of Minneapolis, *supra* note 185, 86 N.W.2d at 660–668.

224. See cases cited *supra* note 201.

This has been recognized in cases holding that rents received by a utility from the leasing of operating properties must be included in the utility's operating income.[225] More directly in point, the cases, as we have seen, generally agree that consumers have the superior claim to capital gains achieved on depreciable assets while in operation [226] and this, we believe, is as it should be. Investors who are afforded the opportunity of a fair return on a secure investment in utility assets are hardly in position to complain that they do not receive their just due from the traveling public. On the other hand, it is eminently just that consumers, whose payments for service reimburse investors for the ravages of wear and waste occurring in service, should benefit in instances where gain eventuates—to the full extent of the gain.[227]

B. *Application of Doctrine In This Case*

■ We direct our attention now to the situation presented at bar with a view to resolving the conflicting claims of Transit's investors and farepayers to the capital gains in issue. At the outset, we lay aside the rule that capital gain accompanies risk of capital loss.

As we point out today in Democratic Central Committee v. Washington Metropolitan Area Transit Commission,[228] and as the Commission itself admits,[229] there has never been any risk of financial loss, actual or foreseeable, on the parcels of land which concern us here. Despite an ever-present risk of obsolescence of land for utility purposes, land values since acquisition of the properties by Transit have climbed steadily in the Nation's Capital, and throughout Transit's regulatory history could only have been expected to do so. So, while the risk of obsolescence is insoluble, the risk of any consequent financial loss has been foreclosed by the rising real estate market. It would be little more than an exercise in abstract logic to invoke the principle of gain-follows-loss where the financial risk is wholly illusory. Consequently, we confine ourselves to the second doctrinal consideration discussed—that benefit follows burden—in determining where the equities lie here. The exploration we find we must make is ramified, necessitating examination of the history of the acquisition of the questioned assets, the allocation of burdens and the accrual of advantages associated with the holding of those assets, and thereafter a balancing of the respective

225. Fleming v. Illinois Commerce Comm'n, 388 Ill. 138, 57 N.E.2d 384, 395 (1944), appeal dismissed and cert. denied, 324 U.S. 823, 65 S.Ct. 686, 89 L.Ed. 1393 (1945) ; Pekin Water Works Co., 82 P. U.R.3d 460, 466 (Ill.Commerce Comm'n 1970) ; Illinois Commerce Comm'n v. Public Serv. Co., 4 P.U.R. (n.s.) 1, 27–30 (Ill.Commerce Comm'n 1934) ; Hillsborough & M. Tel. Co., 14 P.U.R.3d 212, 217 (N.J.Bd. Pub.Util.Comm'rs 1956) ; Farmer's Union Tel. Co., 84 P.U.R. (n.s.) 82, 85 (N.J.Bd.Pub.Util.Comm'rs 1950) ; Public Serv. Comm'n v. Mountain Fuel Supply Co., 73 P.U.R. (n.s.) 428, 441 (Utah Pub.Serv.Comm'n 1947).

226. See discussion in Part II(A), *supra.*

227. The Commission has recognized that Transit's farepayers are entitled to capital gains on depreciable assets withdrawn from service at least to the extent of reimbursement for their contributions to depreciation expenses on such assets. See Part II(A), *supra*, at notes 57–64.

PUC, the Commission's predecessor, recognized that the farepayers' entitlement may extend beyond mere reimbursement and this court has done so as well. See Part II(A), *supra*, at notes 33–50. We perceive no justification, absent extraordinary circumstances, for limiting farepayers to only a part of the gain. Their right to its benefit derives from the fact that they have borne the financial burden of loss of serviceability of the withdrawn assets and the risk that such loss might occur prematurely. Had the gain been too small to enable full reimbursement, they would have suffered the loss on the remainder. Elemental justice requires that they be awarded the full gain, even though it exceeds the amount necessary for reimbursement.

228. Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, at nn. 101–106.

229. Brief for Respondent at 13.

interests competing for the gains at stake. We undertake these tasks and, discharging·them, we conclude that Transit's farepayers must prevail.

### —Acquisition History And Allocation of Burdens

In 1956, Transit was awarded its franchise to operate a mass transportatio system within the Washington metropolitan area.[230] The franchise was conditioned upon Transit's acquisition of the assets of Capital Transit Company (Capital),[231] which for many years had served the area through a system in which both streetcars and buses were employed. Transit purchased Capital's assets and on August 15, 1956, commenced its own operation. The parcels of realty upon which this litigation centers were a part of Transit's acquisition from Capital.[232]

At the time of Transit's takeover, Capital's assets were valued on its books at approximately $23.8 million.[233] Transit's purchase price was about $13.5 million,[234] of which only $500,000 represented an actual cash investment.[235] The balance ultimately came partly from Capital's cash on hand and partly from the sale of certain of Capital's properties, but mostly from farebox revenues after Transit went into business.[236]

Transit's franchise imposed the requirement that Capital's streetcar-bus system be gradually converted into an all-bus system throughout the metropolitan area.[237] This program necessitated the removal of the abandoned streetcar tracks and the regrading and repaving of the abandoned track areas,[238] at an estimated cost of $10,441,958.[239] To accommodate that cost, PUC established a reserve for track removal and repaving,[240] and directed the accrual of $1,044,196 thereto annually for ten years.[241] And at an early stage in Transit's regulatory history, the question arose as to whether those accruals should be made by Transit's investors through capital contributions or from Transit's consumers in the form of higher fares.

This was an expense with two aspects, and the nature of each militated, in terms of ratemaking law, against the ratepayers. The first was the loss incidental to abandonment of the rail facilities which had·passed from Capital to

---

230. Pub.L. No. 757, 70 Stat. 598 (1956) (Franchise Act). See also H.R.Rep.No. 2751, 84th Cong., 2d Sess. (1956).

231. Id. at tit. II, §§ 201(a), 202, 203.

232. See appendix.

233. S.Rep.No.91–760, 91st Cong., 2d Sess. 3 (1970).

234. Id., D. C. Transit Sys., Inc. (Order No. 4631), supra note 164, 33 P.U.R.3d at 158.

235. S.Rep.No.91–760, 91st Cong., 2d Sess. 3 (1970).

236. Id.

237. The Franchise Act, tit. I, pt. 1, § 7, 70 Stat. 598, 599 (1956), provides:

The Corporation shall be obligated to initiate and carry out a plan of gradual conversion of its street railway operations to bus operations within seven years from the date of the enactment of this Act upon terms and conditions prescribed by the Commission, with such regard as is reasonably possible when appropriate to the highway development plans of the District of Columbia and the economies implicit in coordinating the Corporation's track removal program with such plans; except that upon good and sufficient cause shown the Commission may in its discretion extend beyond seven years, the period for carrying out such conversion. All of the provisions of the full paragraph of the District of Columbia Appropriation Act, 1942 (55 Stat. 499, 533), under the title "Highway Fund, Gasoline Tax and Motor Vehicle Fees", subtitle "Street Improvements", relating to the removal of abandoned track areas, shall be applicable to the Corporation.

238. See District of Columbia Appropriation Act of 1942, 55 Stat. 499, 533 (1941).

239. D. C. Transit Sys., Inc. (Order No. 4631), supra note 164, 33 P.U.R.3d at 155.

240. Id.

241. Id.

Transit. As we have pointed out, it has ofttimes been held that permanent losses on premature property retirements are to be amortized as operating expenses for future consumers to absorb.[242] In similar fashion, PUC, Transit's then regulatory agency, treated the undepreciated cost of the tracks and streetcars acquired by Transit as a part of the depreciation expense recoverable from its farepayers.[243] This item of cost was anticipated to aggregate more than $5 million.[244] The second aspect of the expense was the cost of removing the tracks, and regarding and repaving the street areas from which they were removed. That cost, too, PUC ruled, was to be paid by the farepayers.[245] The estimate of this item of cost was, as we have stated, in excess of $10 million.[246]

PUC's treatment of the latter item did not, however, go unchallenged. In Bebchick v. Public Utilities Commission,[247] consumers contended that the expense of track removal and street repaving was a burden which Transit's investors had assumed by the terms of the franchise[248] and so was not properly an operating cost. They asserted, in their words, that "it is unreasonable and unlawful to require the farepayers to make contributions of capital to Transit by the device of an allowance for track removal and repaving."[249] To buttress this point, they adverted to Transit's purchase of Capital's assets at more than $10 million less than their book value, and argued that that came about in consequence of Transit's assumed track removal and repaving obligation. The argument failed, however, and the point respecting track

removal and repaving costs was lost, when this court concluded that the benefit of the reduced purchase price was being passed on to Transit's consumers.[250]

A full understanding of the basis of so much of our holding in *Bebchick* requires some elaboration of the technique PUC utilized in dealing with the $10 million difference between Capital's book value and Transit's purchase price of the acquired assets. The portion of the purchase price assignable to road and equipment, including the parcels of realty under scrutiny now,[251] was $10,339,041 less than the depreciated original cost of assets in those categories as carried on Transit's books.[252] As we were later to explain,

> Transit's allowances for depreciation thereon could, of course, have been related to its own acquisition cost; but this would have required the development of new depreciation rates computed on remaining life, and new depreciation bases derived in part from distribution of the purchase price among the items of property acquired. To save the labor incidental to that process, however, [PUC] . . . ordered that two things be done. One was the establishment of [an] acquisition adjustment account to accommodate an amortization, over a ten-year period beginning August 15, 1956, of the $10,339,041 difference in acquisition costs to Capital and Transit, respectively. The other was a direction that depreciation be accrued on the basis of Capital's original cost and at the rates previously fixed for Capital,

---

242. See Part IV(A), *supra*, at notes 201, 211–218.

243. D. C. Transit Sys., Inc. (Order No. 4631), *supra* note 164, 33 P.U.R.3d at 155–60.

244. *Id.* at 156–57.

245. *Id.* at 155–56.

246. See text *supra* at note 239.

247. *Supra* note 185.

248. See note 237, *supra*.

249. 115 U.S.App.D.C. at 220, 318 F.2d at 191.

250. *Id.* at 221, 318 F.2d at 192.

251. See D. C. Transit Sys., Inc. (Order No. 3592), at 5, exh. 2 (D.C.Pub.Utils. Comm'n Nov. 27, 1957) (unreported).

252. D. C. Transit Sys., Inc. (Order No. 4631), *supra* note 164, 33 P.U.R.3d at 155.

with ten annual offsetting credits to operating expenses of $1,033,904 derived from the amortization.[253]

The objectives of this accounting arrangement thus appear sharply. With the addition to Transit's purchase price of annual offsetting credits to operating expenses, Transit's investors would ultimately pay Capital's book value of road and equipment in full. And farepayers, in consequence of the offsetting credits, would ultimately contribute $10 million less to Transit's operational costs. The investors would, of course, benefit from depreciation at Capital's depreciation rates; theoretically, post-acquisition depreciation by this method would work out to the same amounts as if new depreciation bases had been established at Transit's acquisition costs. So, in *Bebchick,* after examining PUC's explanation of the foregoing,[254] we concluded that "[i]n this manner the Commission gave consideration to the reduced purchase price paid by Transit."[255] "The farepayers," we explained, "will receive benefit in the form of reduced depreciation in the total amount of $10,399,041 to be written off annually in the amount of $1,033,904."[256]

*—Accrual of Advantages*

As we have stated, the properties upon which our present inquiry focuses were all acquired by Transit from Capital in 1956. They came to Transit as a single package—all of the assets Capital then owned; Transit got the assets, not by buying them as such, but rather by buying all of Capital's outstanding capital stock.[257] And in the great majority of instances, the purchased real estate which is no longer devoted to public use was removed from service because of the conversion from a trolley-bus to an all-bus system of transportation. These were parcels on which were located car-barns, repair shops and other buildings used and useful when the streetcars were still running;[258] because these properties were unsuited to Transit's all-bus operation, the conversion rendered them surplus to Transit's needs. And, lest we forget, the financial burden of the conversion was, in its entirety, placed upon those who rode Transit's vehicles.[259]

From the foregoing discussion, the realities of the situation become plain enough. Transit got from Capital an on-going transportation system, including improved land, which the latter had acquired years before on obviously lower real estate markets. The price Transit paid Capital was calculated, not on fair market value of the acquired assets, but on a fixed per-share valuation of Capital's stock, which worked out to much less than even the value of the assets as depreciated on Capital's books.[260] We know that the price of Capital's road and equipment was some $10 million less than book value,[261] and we cannot approximate how much less than fair market value at the time of acquisition the total price for all assets may have been.[262] There is nothing to justify an assumption that the price allocable to the

253. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 367, 415 F.2d at 947.

254. Bebchick v. Public Utils. Comm'n, *supra* note 185, 115 U.S.App.D.C. at 220–221, 318 F.2d at 191–192.

255. *Id.* at 221, 318 F.2d at 192.

256. *Id.*

257. D. C. Transit Sys., Inc. (Order No. 4631), *supra* note 164, 33 P.U.R.3d at 155–60.

258. See appendix.

259. See text *supra* at notes 242–256.

260. D. C. Transit Sys., Inc. (Order No. 4631), *supra* note 164, 33 P.U.R.3d at 158.

261. See text *supra* at notes 233–234.

262. The original cost of Capital's road and equipment alone was $49,818,718. D. C. Transit Sys., Inc. (Order No. 4631), *supra* note 164, 33 P.U.R.3d at 162. The remaining assets purchased, amounting to $8,592,952.54, consisted in cash and miscellaneous items. D. C. Transit Sys., Inc. (Order No. 3592), *supra* note 251, at exh. 2.

parcels of realty here involved was anywhere near their true market value.[263]

In addition to what ostensibly was an acquisition of the properties at an excellent bargain,[264] Transit secured other valuable advantages—all at the expense of its traveling public. Within four years after commencing operations, Transit, largely as a result of legislative policy declared in its franchise,[265] began obtaining fare increases on the basis of its gross operating revenues rather than on the system rate base which had been employed for Capital.[266] Thus Transit could carry on its transportation business with a minimum of invested capital, and that it has done as long as it has been a public utility.[267] With the franchise-conferred monopoly[268] of the lion's share of mass transportation in the Washington metropolitan area,[269] Transit was enabled not only to function with a capital outlay of but $500,000 plus reinvested gains and earnings from operations,[270] but also to distribute $4,390,000 in dividends—an actual paid-out return of 830 percent on original equity—during the first decade of its existence.[271]

263. It was for this reason that PUC, in establishing Transit's rate base prior to shifting to the operating ratio method, see note 266, *infra*, refused to accept the price which Transit paid to Capital as a true reflection of the fair value of the assets acquired. D. C. Transit Sys., Inc. (Order No. 4631), *supra* note 164, 33 P.U.R.3d at 155.

264. PUC's utilization of the acquisition adjustment account, see text *supra* at notes 251–256, in no way qualifies this characterization. The acquisition adjustment device raised the investors' cost-of-purchase from $13.5 million to $23.8 million, but the $23.8 million was Capital's book value, not the fair market value, of the assets acquired. Original cost of those assets exceeded $58 million, see note 262, *supra*. The land included among those assets, acquired much earlier on obviously much lower markets, surely had a market value at Transit's acquisition which was greatly higher than Capital's book value based on original cost. See text *supra* at notes 260–262 and note 262, *supra*.

265. See Franchise Act, tit. I, pt. I, § 4, 70 Stat. 598 (1956).

266. When Transit succeeded Capital, the latter's rates were set on a rate base established on original cost. See Spiegel v. Public Utils. Comm'n, 145 F.Supp. 679, 680 (D.D.C.1956), aff'd, 101 U.S. App.D.C. 93, 94–95, 247 F.2d 84, 85–86 (1957). In Transit's first fare proceeding, PUC declined to switch to the operating ratio method, D. C. Transit Sys., Inc. (Order No. 4480), 25 P.U.R.3d 371, 374 (1958); instead, it fixed the rate base at $14,167,375 by giving equal weight to Capital's depreciated original cost and Transit's purchase price. *Id.* at 374–76. See also D. C. Transit Sys., Inc. (Order No. 4631), *supra* note 164, 33 P.U.R.3d at 163–64. In 1960, however, PUC permitted the shift to operating ratio, with the rate-base rate of return method as a check on reasonableness of the return. *Id.* at 144–48. See also D. C. Transit Sys., Inc. (Order No. 4735), *supra* note 164, 38 P.U.R.3d at 25–26. We approved the shift in Bebchick v. Public Utils. Comm'n, *supra* note 185, 115 U.S.App. D.C. at 219–220, 318 F.2d at 190–191. On the advantage a transit company derives from use of the operating ratio method rather than a system rate base, see 1 A. Priest, Principles of Public Utility Regulation 221–24 (1969); Wright, Operating Ratio—A Regulatory Tool, 51 Pub.Util.Fort. 24–29 (1953).

267. See S.Rep.No.91–760, 91st Cong., 2d Sess. 3 (1970); D. C. Transit Sys., Inc. (Order No. 1216) (WMATC May 19, 1972), at 9–10 (as yet unreported), quoted on affirmance in D. C. Transit Sys.. Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 171, 151 U.S.App.D.C. at 227 n. 28, 466 F.2d at 398 n. 28.

268. Franchise Act, tit. I, pt. 1, § 3, 70 Stat. 598 (1956).

269. Transit was one of four utilities operating regular-route transportation systems in the area. One of the other three was a wholly-owned subsidiary of Transit, and the other two commanded but fragments of the transit market and operated almost exclusively in suburban areas.

270. See sources cited *supra* note 267.

271. S.Rep.No.91–760, 91st Cong., 2d Sess. 3 (1970). And see D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 171.

To the foregoing circumstances must be added others—hardly less important, and equally contributors to a potential windfall. After Transit's acquisition from Capital, the properties now questioned remained in operating status for various periods, and indeed two apparently always so remained.[272] In that status they have possessed incidents and immunities they could not summon below the line. They have commanded preferred real estate tax treatment.[273] They were, as above-the-line assets, a part of Transit's rate base during the years prior to adoption of the operating ratio method of establishing its margins of return.[274] Even under the latter method, in vogue since 1960,[275] the properties have counted in the computation of Transit's equity, a factor in turn influencing Transit's rate of return from transportation operations.[276] And they have continued to appreciate in value on the steadily rising local real estate market, which unhesitatingly we notice judicially, while enjoying these advantages as operating properties.

Surely the greatest advantage to Transit's investors—and one more specifically referable to the problem at hand—was derived from the scrapping of Capital's street railways in favor of a motorized transportation system. The changeover, as we have said, was mandated by Transit's franchise,[277] and the treatment accorded the changeover program worked strongly in Transit's favor. Assessment of the incidental loss of more than $5 million on Transit's riders[278] resulted in rapid recoupment of investors' equity in the abandoned rail facilities by amortization through Transit's fareboxes. The expense of track removal and repaving to date—some $10 million more—was likewise assessed against the farepayers.[279] Thus the conversion to Transit's all-bus operation has been speedily accomplished, and wholly without expense to Transit. And the crowning consideration is the incontrovertible fact that the conversion, at full cost to the farepayers, was the *sine qua non* to release of valuable real properties from operating roles in the transportation scheme for uses in non-transportation ventures.[280]

Both the Commission and this court have recognized the efficacy of this relationship of Transit's large-scale retirement of real estate from operating status to the track removal and repaving program and the financial burdens it imposed on Transit's farepayers. In 1959, when in D.C. Transit System, Inc. (Order No. 4577)[281] Transit's sale of its Fourth Street Shops and Southern Carhouse[282] was examined, and a decision was made as to the allocation between Transit's consumers and its investors of the net profits attributable to the physical improvements on those properties, PUC declared:

In light of the franchise of the company requiring a gradual program of conversion from railway to bus operations over a 7-year period from January 24, 1956, we are unable to disassociate the instant transaction from the imminent retirement of all rail property under the mandate contained

---

272. See appendix.

273. See Franchise Act, tit. I, pt. 1, § 9(g), 70 Stat. 598, 601 (1956), prescribing a statutory formula which requires a Commission determination that Transit failed to earn a 6½% rate of return during the previous year. From 1961 to 1968, inclusive, real estate taxes from which Transit was exempted totaled $1,381,177. S.Rep.No.91–760, 91st Cong., 2d Sess. 3 (1970).

274. See note 266, *supra*.

275. See note 266, *supra*.

276. See note 266, *supra*.

277. See note 237, *supra*.

278. See text *supra* at notes 243–250.

279. See text *supra* at notes 245–250.

280. See appendix.

281. *Supra* note 33.

282. See Part II(A), *supra* at notes 33–55. See also Bebchick v. Public Utils. Comm'n, *supra* note 185, 115 U.S.App. D.C. at 219–223, 318 F.2d at 190–194.

in the franchise. We cannot ignore the probability that full provision for depreciation will not have been provided when the rail facilities are abandoned and retired by reason of conversion. The company has consistently taken the position that any retirement loss in this connection should be recovered by charges against the customers, and the staff has heretofore indicated its agreement.[283] However, if the customers are to be required to bear the burden of extraordinary retirement losses incident to the whole conversion program, it appears equitable that they should share, at least to some extent, in extraordinary retirement gains of the nature here under consideration.[284]

The extent of the sharing, PUC made clear, was to be ascertained by "a fair balance between the interests of the public and those of the company's investors;"[285] and on judicial review of Order No. 4577, we affirmed.[286]

Six years later, in D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission,[287] this court sitting en banc, was called upon to scrutinize the transaction in a different context. An objection to allowance of a depreciation charge for abandoned rail facilities was predicated in part on the claim that the sales were occasioned by the conversion program, and that, in consequence, the profits realized should be deemed a recoupment of obsolescence.[288] Transit asserted, inter alia, that the sales were unrelated to the program, and although we acknowledged

"some force to Transit's contention,"[289] we neither reexamined nor disapproved the Commission's resolution on that score.[290] But our opinion made manifest our view that if, as the Commission thought, there was a connection between the sales and the conversion program, farepayers' sharing in the proceeds was consonant with the equities of the situation.[291]

This became the plainer when we moved to a consideration of a second transaction urged in support of disallowance of the depreciation charge.[292] That transaction was Transit's sale of its Georgia and Eastern Terminal in 1962, in which it allegedly reaped a substantial profit on the depreciable portion of the realty.[293] The parties had made no effort to establish the reasons for the sale, apparently because it had occurred after the close of the audit period on which the Commission's projections were based.[294] Transit argued, however, that the only evidence of record demonstrated the disassociation of the sale and the conversion program, basing that position on testimony that before the sale the terminal "was used for bus operations also."[295] We pointed out that that testimony "suggests that it may have been used in Transit's rail operations as well,"[296] and that "it may or may not be true that the sale was in some way related to Transit's conversion to an all-bus system."[297] "If it was," we continued, "the Commission should address itself to the question, as did the PUC in the case of the Fourth Street Shops,[298] of whether the riders should be afforded

283. This position later gained full administrative and judicial acceptance. See text supra at notes 243–256.

284. 30 P.U.R.3d at 412.

285. Id.

286. D. C. Transit Sys., Inc. v. Public Utils. Comm'n, supra note 51.

287. Supra note 18.

288. Id. at 396–397, 350 F.2d at 773–774.

289. Id. at 397, 350 F.2d at 775.

290. See id.

291. See id.

292. See id. at 397–398, 350 F.2d at 775–776.

293. But see Part II(A), supra, at notes 60–64.

294. 121 U.S.App.D.C. at 397–398, 350 F. 2d at 775–776.

295. Id. at 398, 350 F.2d at 776 (emphasis in original).

296. Id.

297. Id.

298. See Part II(A), supra, at notes 33–35.

some participation in the benefits of the sale." [299] And we admonished that "[f]ollowing our remand, . . . the Commission should determine whether the sale of the terminal was occasioned, in whole or in part, by the abandonment of rail operations, and, if it was, whether and to what extent the farepayers should share in the proceeds." [300]

It cannot be gainsaid, then, that several important propositions are firmly imbedded in our jurisprudence. Transit's investors cannot automatically garner the profits achieved on dispositions of depreciable real estate which in some way have been affected by the conversion program. Relevant inquiries are whether the disposition "was occasioned, in whole or in part, by" the conversion program [301] or "was in some way related to" it.[302] If so, Transit's farepayers are entitled to a fair share of such profits. The extent to which they are to share depends upon "a fair balance between the interests of the public and those of the company's investors." [303]

#### —The Commission's Claimed Accounting Practice

We are advertent to the consideration that the propositions just discussed have developed in litigation directly referable to allocations of profits gained on disposition of depreciable utility assets. We think, however, that no difference in principle can be justified solely on the ground that the asset in question, or some part thereof, happens to be nondepreciable. Both PUC and the Commission have made such a distinction on the stated theory that capital gains from nondepreciable property invariably belong to investors.[304] Counsel for the Commission contends additionally that we should defer to a uniform accounting rule to that effect which the Commission is said to have pursued. For two reasons, we reject these positions.

In the first place, neither the Commission nor its counsel has pointed to any agency-promulgated accounting rule operative as to the value-appreciations on the lands in question. The Compact empowered the Commission to prescribe uniform systems of accounts for carriers functioning under its jurisdiction, but required that its authority to do so be exercised "by regulation." [305] No such regulation of the Commission or its predecessor agency relevant to the problem at hand has ever been identified either in the Commission's opinions or its

---

**299.** 121 U.S.App.D.C. at 398, 350 F.2d at 776.

**300.** *Id.* On remand, D.C. Transit Sys., Inc. (Order No. 563), *supra* note 18, the Commission found that the abandonment of the terminal and its subsequent sale were unrelated to the conversion program. It said:

> A review of the transcript reveals that retirement of this property was not associated with the retirement of rail property. While the rail system was in use, the Georgia and Eastern Terminal served in a dual capacity, both as a terminal for rail service and for bus service. After the rail system was phased out, the terminal was used exclusively in bus operations. Sometime thereafter, due to the request of riders to move the terminal further north, the company relocated its terminal in Silver Spring and discontinued the terminal facilities at the Georgia and Eastern location. It is apparent to the commission that the termination of this facility as property used and useful in the transit business was predi-

cated solely on the realignment of its bus terminal facilities and its removal from service was completely disassociated with the termination of the rail operation. Thus, it is our determination that the sale of the terminal was occasioned neither in whole nor part by the abandonment of rail operations. Therefore, the ratepayer is not entitled to share in any portion of the proceeds of that sale, unless there was a profit on the depreciable portion of the asset sold. There was none in this case.

*Id.* at 33–34. In this aspect, Order No. 563 was not brought under judicial review.

**301.** See text *supra* at note 300.

**302.** See text *supra* at note 299.

**303.** See text *supra* at note 285.

**304.** See Part III(B), *supra*, at notes 96–111.

**305.** "Each carrier subject to the Commission shall keep such accounts, records,

counsel's argument.[306] The opinions contain only the gratuitous pronouncements on the subject to which we have alluded,[307] and the argument is similarly unrevealing.

In 1966, the Commission did adopt an accounting regulation dealing with allocations of value-appreciations of depreciable properties.[308] Since then, the Commission has made explicit reference to that regulation in its decision-making and in its argument here.[309] It is difficult to believe that if indeed the Commission had a counterpart applicable to the nondepreciable properties under scrutiny, it would leave us in the dark about it. We may assume that, as a matter of unwritten policy, the Commission has indulged accounting techniques conformable with its mistaken notion of a settled principle on the subject,[310] but that is a far cry from the deliberate, reasoned rulemaking which the Compact obviously contemplates.[311] In sum, neither PUC nor the Commission has ever spoken of an extant accounting regulation treating gains on the nondeprecia-

ble assets in issue, and it is well settled that counsel's own *post hoc* rationalizations are not an acceptable substitute.[312]

Moreover, even if we could agree that the Commission, by virtue of its brief comments in Orders Nos. 245 and 563 and those of PUC in Order No. 4577,[313] had ordained that on Transit's books the appreciation on in-service nondepreciable assets should be credited to investors, the mere adoption of such an accounting practice would not terminate our inquiry. Accounting procedures are not self-justifying; like other regulatory action of the Commission, they must reflect a rational allocation of economic rights and responsibilities between a utility's investors and consumers.[314] The simple fact that an agency treats an item a certain way for purposes of its uniform system of accounts does not mark the end of judicial scrutiny; on the contrary, a reviewing court must assure itself that the accounting practice prescribed is consistent with underlying substantive principles of public utility law.[315] To permit an account-

and memoranda with respect to activities in which it is engaged . . . as the Commission *by regulation* prescribes. The Commission shall *by regulation* prescribe the form of such accounts, records, and memoranda, and the length of time that such accounts, records and memoranda shall be preserved." Compact, *supra* note 12, tit. II, art. XII § 10(b) (emphasis supplied).

306. While "[a]ll rules, regulations, orders" and "decisions" of PUC, and "[a]ll" "other action prescribed" by it, survived the Commission's succession until changed, *id.* § 21, there is no showing that PUC ever acted formally on the matter under discussion or that, if it did the Commission ever rested its own action thereon.

307. See text *supra* at notes 89–111.

308. Regulation 61, which we discuss in No. 23,720, Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, and No. 24,398, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, in connection with issues raised in those cases. That regulation, treating as it does gains on depreciable assets, has no direct applicability to the issue involved in the instant case.

309. See D.C. Transit Sys., Inc. (Order No. 1090), *supra* note 64, 85 P.U.R.3d at 513–14.

310. See text *supra* at note 107.

311. See note 305, *supra*.

312. *E. g.*, Burlington Truck Lines v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp., 318 U.S. 80, 92–95, 63 S.Ct. 454, 87 L.Ed. 626 (1942); Local 833, UAW v. NLRB, 112 U.S.App.D.C. 107, 112–113, 300 F.2d 699, 704–705, cert. denied, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962).

313. See text *supra* at notes 60–64, 96–111.

314. See Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 350, 358–359 & n. 86, 415 F.2d at 930, 938–939 & n. 86.

315. See In re Republic Light, Heat & Power Co., 265 App.Div. 53, 37 N.Y.S.2d 947, 949 (Sup.Ct.App.Div.1942); New York Edison Co. v. Maltbie, 244 App. Div. 685, 281 N.Y.S. 223, 226 (Sup.Ct. App.Div.1935), aff'd, 271 N.Y. 103, 2 N.E.2d 277, 279 (1936).

ing device to dictate the rule of law is to allow the tail to wag the dog. To judicially accept an accounting method without inquiry as to its reasonableness is to pervert the law. And to yield, on judicial review, unquestioning obeisance to administrative authority over utility accounting is to abdicate the responsibility to review.

In the final analysis, administrative regulation by prescription of accounting methods stands on no higher ground than regulation by adjudication where substantial interests of investors and consumers are at stake. Accounting

directives, no less than other exertions of administrative power, must survive the test of rationality.[316] And the validity of the administrative exercise must be judged solely on the grounds upon which the agency based it.[317] Our examination of the grounds which the Commission, when it acted, proffered in support of the accounting practice under scrutiny has left us wholly unsatisfied as to its rationality. We have adverted to the two premises upon which the Commission has rested its distinctive treatment of gains on nondepreciable property.[318] We have also noted that by

316. Legislative grants of administrative authority over public utility accounting are designed to meet the informational needs of effective regulation and the public needs of economical rates, particularly as either may be affected by inflationary write-ups or expense padding. American Tel. & Tel. Co. v. United States, 299 U.S. 232, 237, 239, 240, 246, 57 S.Ct. 170, 81 L.Ed. 142 (1936) ; Norfolk & W. Ry. v. United States, 287 U.S. 134, 140, 53 S.Ct. 52, 77 L.Ed. 218 (1932) ; Kansas City S. Ry. v. United States, *supra* note 198, 231 U.S. at 440, 449, 34 S.Ct. 125; ICC v. Goodrich Transit Co., 224 U.S. 194, 211, 216, 32 S.Ct. 436, 56 L.Ed. 729 (1912). Compare United States v. New York Tel. Co., 326 U.S. 638, 66 S.Ct. 393, 90 L.Ed. 371 (1946); Northwestern Elec. Co. v. FPC, 321 U.S. 119, 64 S.Ct. 451, 88 L.Ed. 596 (1944). Supervision of accounting, of course, is due the same respect accorded other administrative action, and "in gauging rationality, regard must steadily be had to the ends that a uniform system of accounts is intended to promote." American Tel. & Tel. Co. v. United States, *supra*, 299 U.S. at 237, 57 S.Ct. at 172. Deference to an agency's treatment of accounting problems reaches its zenith where the issue is one of pure accounting, notwithstanding incidental intrusion upon management prerogatives, see FPC v. East Ohio Gas Co., 338 U.S. 464, 474–476, 70 S.Ct. 266, 94 L.Ed. 268 (1950); United States v. New York Tel. Co., *supra*, 326 U.S. at 654–655, 66 S.Ct. 393; Northwestern Elec. Co. v. FPC, *supra*, 321 U.S. at 123–124, 64 S.Ct. 451; American Tel. & Tel. Co. v. United States, *supra*, 299 U.S. at 236–237, 57 S.Ct. 170; Norfolk & W. Ry. v. United States, *supra*, 287 U.S. at 141–143, 53 S.Ct. 52; Kansas City S. Ry. v. United States, *supra*,

231 U.S. at 441, 444, 34 S.Ct. 125, but even those features of agency action may be judicially examined for arbitrariness. Northwestern Elec. Co. v. FPC, *supra*, 321 U.S. at 124, 64 S.Ct. 451; American Tel. & Tel. Co. v. United States, *supra*, 299 U.S. at 236–237, 57 S.Ct. 170; Norfolk & W. Ry. v. United States, *supra*, 287 U.S. at 143, 53 S.Ct. 52; Arkansas Power & Light Co. v. FPC, 87 U.S.App. D.C. 385, 387, 185 F.2d 751, 753 (1950), cert. denied, 341 U.S. 909, 71 S.Ct. 621, 95 L.Ed. 1346 (1951). See also Kansas City S. Ry. v. United States, *supra* note 198, 231 U.S. at 452–453, 456–457, 34 S.Ct. 125. *A fortiori*, judicial responsibility is as grave where the accounting issue draws in substantive relationships of utility and consumers. As this court has specifically held, accounting actions of the very type involved here—those which in effect regulate allocations of value-appreciations achieved on operating utility assets—may be freely reviewed to enable decision of "questions of law" and determination as to whether the basis for action is "unreasonable arbitrary, or capricious." D.C. Transit Sys., Inc. v. Public Utils. Comm'n, *supra* note 51, 110 U.S.App.D.C. at 242, 292 F.2d at 735.

317. SEC v. Chenery Corp., *supra* note 312, 318 U.S. at 87, 63 S.Ct. 454; Bond v. Vance, 117 U.S.App.D.C. 203, 204, 327 F.2d 901, 902 (1964) ; Local 833, UAW v. NLRB, *supra* note 312, 112 U.S. App.D.C. at 113, 300 F.2d at 705; NLRB v. Capital Transit Co., 95 U.S.App.D.C. 310, 313, 221 F.2d 864, 867 (1955); Democrat Printing Co. v. FCC, 91 U.S. App.D.C. 72, 77–78, 202 F.2d 298, 302– 303 (1952) ; Mississippi River Fuel Corp. v. FPC, 82 U.S.App.D.C. 208, 224, 163 F.2d 433, 449 (1947).

318. See text *supra* at notes 107–111.

our appraisal those premises are fatally defective.[319] It necessarily follows that we must now reject the claim that the Commission has effectively decreed the disposition of value-appreciations on nondepreciable utility assets by an appropriate exercise of its authority over utility accounting.

—*The Balance Here*

 The allocation between investors and consumers of capital gains on in-service utility assets, we have declared, rests essentially on equitable considerations.[320] The allocative process, we have said, necessitates a delicate balancing of the interests of investors and consumers in light of the governing equitable principles.[321] The constant effort must be a distribution of the gains as fairness and justice may require. In particular instances, however, the direction in which the equities lie is so vividly marked by the circumstances of the case that the allocation properly to be made emerges plainly. We think such an instance is presented here.

 The relevant principles can be stated simply. Consumers become entitled to capital gains on operating utility assets when they have discharged the burden of preserving the financial integrity of the stake which investors have in such assets.[322] Their entitlement is established, too, when it is manifest that investors have benefitted measurably from special treatment accorded those assets in the past.[323] And in appraising the equities, neither administrative nor judicial tribunals are at liberty to ignore

economic reality. The stark reality here is that Transit's farepayers have long been saddled with the burdens incidental to the properties in issue while they remained in operating status. Theirs were the expenses of ordinary maintenance [324] and depreciation,[325] and the risks of loss from casualty [326] and obsolescence,[327] associated with those properties. These they shouldered over the years not only for Transit but also for Capital, Transit's predecessor. Theirs also were the losses wrought by the conversion program, which directly made transfers of some assets, nondepreciable as well as depreciable, from above to below the line possible.[328] And Transit's investors have profited, not only from these arrangements of burdens, but also from favorable treatment of the operating assets in other ways.[329] By our assessment, these circumstances tip the scale in favor of Transit's farepayers, so much so as to earn for them the gains beyond the shadow of a doubt.

 This court has never adopted the Commission's position that capital gains on nondepreciable assets inure to investors only.[330] We decline to adopt that position now. Our historical analysis of the interests of investors in value-appreciations of operating utility assets demonstrates beyond a doubt that the burden of safeguarding the utility's investment in all of its assets—depreciable and nondepreciable—is legally assigned in its entirety to consumers.[331] As we have further pointed out, even were the risk on the lands involved here theoretically one which had been carried by the

319. See text *supra* at notes 110–111.

320. See text *supra* at Part IV (A).

321. See text *supra* at note 177.

322. See Part IV (A), *supra*, at notes 181–227.

323. See Part IV (A), *supra*, at notes 272–282.

324. See Part IV (A), *supra*, at notes 219–220.

325. See Part IV (A), *supra*, at notes 197–218.

326. See Part IV (A), *supra*, at note 186.

327. See Part IV (A), *supra*, at note 201.

328. See Part IV (B), *supra*, at notes 243–246.

329. See Part IV (A), *supra*, at notes 272–282.

330. See Part II (B), *supra*, at notes 96–111. As we there point out, the Commission's several pronouncements on that score have never been subjected to judicial review.

331. See Part III, *supra*.

investors, that risk becomes mythical when viewed in light of the high unlikelihood that the value of the lands would decline.[332] Furthermore, measuring the equities of the situation by relevant doctrinal considerations, it is plain that Transit's busriders have shouldered a very significant financial onus with respect to those lands, and that Transit's investors have benefitted uniquely in their ownership of them,[333] and that a reasonable and fair allocation of their appreciation in market value accords that gain to the farepayers.[334] Unlike situations wherein the basis for profit-sharing by farepayers may consist solely in the loss-risk factors associated with depreciable property [335] and the burden of contributions to depreciation reserves [336]—considerations largely or entirely absent in instances of nondepreciable property—farepayers' equities founded upon their assumption of the remaining economic responsibilities [337] —including those occasioned by a costly conversion program [338]—and upon investors' enjoyment of especially-conferred advantages not generally available to others,[339] are precisely the same whether the source of the gain is depreciable or nondepreciable property. We hold that a farepayers' claim so predicated must be recognized and effectuated whether the property be of the one character or the other.

 With respect to the properties not directly related to Transit's conversion to an all-bus transportation system, the equities also weigh in the riders' favor. Transit acquired all of its landholdings at a tremendous bargain when it assumed Capital's franchise,[340] and enjoyed valuable special benefits for them in the years which followed.[341] In none of these benefits did the farepayers share, although they had been charged with major economic responsibilities stemming from Transit's takeover of its predecessor's operations.[342] Given these circumstances, we would be loath to say that the riders are not equitably entitled to the value appreciations on these properties as well. We hold that the farepayers were entitled to all appreciations in the value of the assets in issue, depreciable and nondepreciable,[343] accruing during their tenure as operating properties.

332. See text *supra* at notes 228–229.

333. See text *supra* at notes 264–276.

334. See Part IV(B), *supra*.

335. See Part III(A), *supra*.

336. See Part III(A), *supra*.

337. See text *supra* at notes 257–276.

338. See text *supra* at notes 277–300.

339. See text *supra* at notes 264–276.

340. See text *supra* at notes 260–264.

341. See text *supra* at notes 265–276.

342. See text *supra* at notes 237–250.

343. In referring to the amount of appreciation or gain on the assets while in service, we are speaking of a net figure. The amount which should be credited to the farepayers is not the entire difference between book value and market value of the assets at the time of transfer, but rather that sum minus the taxes and sale expenses which would have been deducted from Transit's profit if the assets had been sold outright instead of simply being moved into nonoperating status.

We also reject the contention that the right of the farepayers to gains in the value of these properties does not ripen until the properties are sold. Our reasons for holding that the right accrues at the time the assets are removed from operating status are discussed more fully in Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, 158 U.S.App.D.C. at ——— – ———, 485 F.2d at 858–860 and in Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, 158 U.S.App.D.C. at ——— – ———, 485 F.2d at 788. It suffices here to point out that the Commission's own Regulation 61 crediting value-appreciations on depreciable assets to the farepayers specifies this practice, and we see no reason for treating nondepreciable assets differently. See Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, —— U.S.App.D.C. at ——— – ———, 485 F.2d at 860.

## V

### DISPOSITION

The foregoing considerations lead us to the conclusion that Order No. 773 is invalid and must be set aside.[344] Thus we reach, as the final chapter of this review, the disposition required by the circumstances that the fares fixed by that order have been charged and paid since it went into effect. To this matter we now proceed.

### A. *Responsibility For Fashioning Relief*

■ The initial question is whether the fashioning of relief from the predicament we face lies properly within the judicial sphere or, instead, the administrative. It is clear to us beyond peradventure that this court and the Commission should share the burden in this case.

A judicial determination that a Commission fare order was invalid has normally called for remediation in a dual aspect. First because the invalid order could not be indulged continued operation, a resetting of fares was ordinarily needed for the future.[345] When there was such a need, it is evident that it had to be met by the Commission. We possess no ratemaking powers as such; our authority is confined within the traditional bounds of judicial review. "Our function" in relation to pure ratemaking "is normally exhausted when we have determined that the Commission has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations."[346] "Our task," we have said, "is likewise at an end when we have ascertained that the Commission has not done so."[347] On the other hand, "even where agency action must be set aside as invalid, but the agency is still legally free to pursue a valid course of action,"[348]—not the present situation[349] —"a reviewing court will ordinarily remand to enable the agency to enter a new order after remedying the defects that vitiated the original action."[350]

■ The second, but quite different, aspect of the relief required where a court has declared a Commission fare order to be invalid, is remediation of the consequences wrought by the order while it was actually operative. This is a problem which can neither be addressed nor solved by another order merely purporting to fix rates. "The Commission," we have declared, "possesses no authority to fix rates for the past."[351] As we have pointed out, "[a]n order prescribing the lawful fares to be charged by a public utility, being essentially legislative in character, ordinarily speaks only for the future."[352] We have heretofore admonished that "we find nothing in the statutory provisions governing the Commission's regulatory responsibilities that indicates an intent to depart from [the] 'customary pattern of fixing rates prospectively.'"[353] Moreover, Order No. 773 has been su-

---

344. Compare Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 358–359, 415 F.2d at 938–939.

345. That is not invariably the situation, however. See text *infra* at notes 354–355.

346. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 362, 415 F.2d at 942 (footnote omitted).

347. *Id.* at 362–363, 415 F.2d at 942–943 (footnote omitted).

348. *Id.* at 359, 415 F.2d at 939.

349. See text *infra* at notes 390–403.

350. *Id.* at 359–360, 415 F.2d at 939–940 (footnote omitted).

351. Williams v. Washington Metropolitan Area Transit Comm'n. *supra* note 16, 134 U.S.App.D.C. at 360, 415 F.2d at 940.

352. *Id.* (footnote omitted).

353. *Id.* at 360–361, 415 F.2d at 940–941 quoting Transcontinental & Western Air, Inc. v. CAB, 336 U.S. 601, 605, 69 S.Ct. 756, 93 L.Ed. 911 (1949) (footnotes omitted).

perseded by later fare orders [354] and, because Transit's transportation operations have since Order No. 773 been publicly assumed, there is no possibility of any additional ratemaking by the Commission.[355] Rectification of the illegal consequences of an unlawful rate order must then consist in something other than retroactive ratemaking.[356]

## B. *The Restitutional Remedy*

 The remedy, rather, is restitution. That was made plain by the decision of this court *en banc* in Williams v. Washington Metropolitan Area Transit Commission.[357] There we found that two orders of the Commission fixing fares for Transit were invalid, and that remand to the Commission for reconsideration of those orders would be futile.[358] "[I]t follows," we held, "that Transit must be compelled to make appropriate restitution for the increased fares it collected" under those orders.[359] We drew support for that conclusion from the "'principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby.'" [360] "This principle," we explained, "is no less applicable to erroneous orders of an administrative agency than to those of a court." [361] Here, no less than in *Williams*, "given our conclusion" that in formulating Order No. 773 "the Commission failed to apply appropriate criteria, and failed to make the inquiries prerequisite to valid exercise of its rate-setting authority, we

354. See D.C. Transit Sys., Inc. (Order No. 882) (WMATC Oct. 29, 1968) (unreported); D.C. Transit Sys., Inc. (Order No. 984), *supra* note 165; D.C. Transit Sys., Inc. (Order No. 1052), 85 P.U.R. 3d 1 (WMATC 1970). There is thus in this case the identical problem we encountered in Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 360, 415 F.2d at 940.

355. See text *infra* at notes 390–403.

356. Compare Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 360–361, 415 F.2d at 940–941. See also Bebchick v. Public Utils. Comm'n, *supra* note 185, 115 U.S.App.D.C. at 232–233, 318 F.2d at 203–204; Washington Gas Light Co. v. Baker, 90 U.S.App.D.C. 98, 104–105, 195 F.2d 29, 35 (1951). And see Wisconsin v. FPC, 373 U.S. 294, 304–306, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963).

357. *Supra* note 16.

358. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 359–361, 415 F.2d at 939–941. There, as here, in addition to the obstacle of retroactive ratemaking, the orders under review had been superseded by subsequent fare orders. *Id.* at 360, 415 F.2d at 940.

359. *Id.* at 362, 415 F.2d at 942 (footnote omitted). We added:

This conclusion is unaffected by the fact that we do not decide that the fares authorized are unjust or unreasonable as a matter of law. Our role as a reviewing court is not to make an independent determination as to whether fares fixed by the Commission are just and reasonable, but rather to insure that the Commission in exercising its ratemaking power, has acted rationally and lawfully.

*Id.*

360. *Id.* at 362 n. 97, 415 F.2d at 942 n. 97, quoting Arkadelphia Milling Co. v. St. Louis S. W. Ry., 249 U.S. 134, 145, 39 S.Ct. 237, 63 L.Ed. 517 (1919). See also Baltimore & O. R. R. v. United States, 279 U.S. 781, 785–786, 49 S.Ct. 492, 73 L.Ed. 954 (1929); Atlantic Coast Line R. R. v. Florida, 295 U.S. 301, 309, 55 S.Ct. 713, 79 L.Ed. 1451 (1935).

361. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 362 n. 97, 415 F. 2d at 942 n. 97. This was well established long prior to Williams. See United Gas Pipe Line Co. v. Mobile Gas Co., 350 U.S. 332, 347, 76 S.Ct. 373, 100 L.Ed. 373 (1956); Atlantic Coast Line R. R. v. Florida, *supra* note 360, 295 U.S. at 309–311, 55 S.Ct. 713; Bebchick v. Public Utils. Comm'n, *supra* note 185, 115 U.S.App.D.C. at 218–219, 232–233, 318 F.2d at 189–190, 203–204; Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 127, 188 F.2d at 23.

could not permit Transit to retain the increased fares, since to do so would be to give legal effect to the Commission's invalid order." [362]

Thus the division of labor to which we have adverted [363] becomes apparent. While promulgation of fares is administrative business,[364] the fashioning of restitutional remedies is a judicial function.[365] We are thus brought to a consideration of the criteria by application of which the amount of restitution in this case must ultimately be determined.

Restitution is essentially an equitable remedy.[366] As we said in *Williams*, "our decision in this regard is to be governed by the equitable considerations which apply to suits for restitution generally." [367] So, "[t]he basic question" in quests for restitution "is whether 'the money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it' and is 'no longer

whether the law would put him in possession of the money if the transaction were a new one.' " [368] To be sure, "[o]rdinarily . . . the proper disposition on setting aside a rate increase unlawfully ordered by the Commission would be to compel the regulated company to restore the entire difference between the higher fares collected under the invalid order and the amount that it would have received from the fare schedule previously in effect," [369] and we have had previous occasion to do just that.[370] "[R]estitution," however, "is not a matter of right, but is 'ex gratia, resting in the exercise of a sound discretion;' " [371] it "is granted to the extent and only to the extent that justice between the parties requires." [372] It accordingly "lies within our authority to direct restitution in an amount less than the whole sum of the increased fares collected under the invalid order, or to deny it altogether, if compelling equitable considerations so dictate." [373]

---

362. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 363, 415 F.2d at 943 (footnote omitted). As we added there, "[t]his is so notwithstanding that we have held neither that the Commission lacked power to order a fare increase, nor even that the fares authorized are, as a matter of law, unjust or unreasonable." *Id.* (footnote omitted). See also note 359, *supra*.

363. See text *supra* at notes 345–356.

364. See text *supra* at notes 345–348.

365. See cases cited *supra* note 361. This is not to say that the court cannot utilize the administrative expertise of the agency to assist the discharge of the judicial function. Indeed, we do so in this very case. See text *infra* at notes 377–387.

366. Atlantic Coast Line R. R. v. Florida, *supra* note 360, 295 U.S. at 309, 55 S.Ct. 713; Restatement of Restitution § 142, comment a at 568 (1937).

367. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 364, 415 F.2d at 944 (footnote omitted).

368. *Id.*, quoting Atlantic Coast Line R. R. v. Florida, *supra* note 360, 295 U.S. at 310, 55 S.Ct. 713.

369. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 364, 415 F.2d at 944 (footnote omitted).

370. See Bebchick v. Public Utils. Comm'n, *supra* note 185, 115 U.S.App.D.C. at 232–233, 318 F.2d at 203–204; Washington Gas Light Co. v. Baker, *supra* note 128, 88 U.S.App.D.C. at 127, 188 F.2d at 23.

371. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 364, 415 F.2d at 944 (footnote omitted), quoting Atlantic Coast Line R. R. v. Florida, *supra* note 360, 295 U.S. at 310, 55 S.Ct. 713.

372. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. 364 n. 106, 415 F.2d at 944 n. 106, quoting Restatement of Restitution, ch. 8 at 596 (1937).

373. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 364, 415 F.2d at 944 (footnote omitted). As we put it there, "[t]he exercise of such an equitable discretion by this court is by no means an usurpation of the administrative powers of the Commission nor is it an arbitrary extension of judicial authority; it is 'mere inaction and passivity in line with the historic attitude of courts of equity

We think the proper measure of restitution in this case lies somewhere between these two extremes. Here, as in *Williams,* "we have found the Commission's action in approving the fare increase to have been invalid, and . . . we have no basis in later valid action of the Commission for inferring that the rates set by [that order] were in fact, just and reasonable. . . . "[374] Here, no more than there, do we find warrant to "give legal effect to those rates by withholding restitution altogether."[375] At the same time, as in *Williams,* "we see no obstacle to our permitting the Company to retain some, though not all, of the proceeds of a fare increase if there is reliable evidence suggesting that it would be inequitable to compel restitution in a greater amount."[376]

## C. *The Commission's Role*

As already indicated, the restitutional task at hand, as a judicial function,[377] has become the responsibility of this court.[378] We inherit that responsibility as an inseparable incident of our duty to review Commission action when it is

properly challenged,[379] and to specify appropriate remediation when the action reviewed is found to be erroneous.[380] In discharging the obligation thus entrusted to us, we must draw upon the resources at our command.[381] As we observed in *Williams,* "[i]n laying down a standard by which to measure Transit's right to retain funds collected under the fare increase, we are aware that we are ill-equipped, even were we authorized to do so, to search the record and reach our independent conclusions as to what would have constituted reasonable fares for the period in question."[382] But "[n]evertheless, the duty to reach a just decision in this regard cannot be shirked, and our effort must be to find a solution which lies within our competence as a reviewing court, while at the same time responding in the fullest possible measure to the equitable considerations that must guide us."[383]

We believe that the best approach to adjustment, in the restitutional sense, of the competing interests of Transit's investors and farepayers in this litigation is a combined effort of the Commission and this court.[384] The

---

for centuries.'" *Id.,* quoting Atlantic Coast Line R. R. v. Florida, *supra* note 360, 295 U.S. at 315, 55 S.Ct. 713.

374. *Id.*

375. *Id.*

376. *Id.* at 364 n. 106, 415 F.2d at 944 n. 106. "The right of a person to restitution from another because of a benefit received is terminated or diminished if, after the receipt of the benefit, circumstances have so changed that it would be inequitable to require the other to make full restitution." Restatement of Restitution § 142(1) (1937).

377. See text *supra* at notes 357–365.

378. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 361–366, 415 F.2d at 941–946.

379. Compact, *supra* note 12, tit. II, art. XII, § 17.

380. When our authority to review a Commission order is properly invoked, we have "exclusive jurisdiction to . . .

modify . . . such order." Compact, *supra* note 12, tit. II, art. XII § 17(a). And see Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 361–366, 415 F.2d at 941–946.

381. See, *e. g.,* In re Peterson, 253 U.S. 300, 312–314, 40 S.Ct. 543, 64 L.Ed. 919 (1920). And when "the public interest is involved . . . equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946).

382. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 134 U.S.App.D.C. at 366, 415 F.2d at 946.

383. *Id.*

384. An available alternative is a reference to a master for aid in working out the amount and details of restitution. See In re Peterson, *supra* note 381, 253 U.S. at 312–314, 40 S.Ct. 543. See also NLRB v. Arcade-Sunshine Co., 76 U.S.App.D.C.

administrative expertise of the Commission is in any event a potentially valuable aid to solution of the restitutional problem, and is the more so in light of the Commission's familiarity with many of its facets. "Judicial and administrative agencies," we recall, " 'are to be deemed collaborative instrumentalities of justice.' "[385] We are also reminded that "[c]ourts have frequently called upon administrative bodies . . . for assistance in connection with the issues falling within the area of administrative competence."[386] In recent years, we have had occasion to enlist the Commission's assistance in working out the elements of restitution made necessary by another order invalidly raising Transit's fares.[387] In the case at bar, we do so once again, and we take this opportunity to outline the techniques the Commission may utilize in providing that assistance.

First, the amount of restitution must be ascertained. This determination will require identification of all properties which Transit shifted from above to below the line prior to issuance of Order No. 773. Once identified the market value of the properties at the time of their transfer to nonoperating status will have to be established. The dollar amount of restitution can then be arrived at by subtracting the book value of the properties from the market value at the time of the transfer. This figure will represent the appreciation in value of the assets, which should have been credited to the riders when the fares prescribed by Order No. 773 were set.

It can be readily seen that this method of determining the amount of restitution will in no way reduce Transit's return during the period the order was in effect to a confiscatory level. As we have pointed out, the only vitiating defect in Order No. 773 was the Commission's failure to allocate to the riders the gain in value of the properties with which we are concerned;[388] in all other respects the fares set by that order must be accepted as just and reasonable. Thus, restitution of the gain to the riders has the automatic effect of reducing the fares collected during the operative period of Order No. 773 to the level of reasonable return to which Transit was entitled.

There remains only the problem of how the amount of restitution, once determined, is to be applied to benefit the farepaying public. As we have observed, regulatory agencies may only fix rates for the future.[389] Moreover, public takeover of Transit's franchise has occurred,[390] and, as a result the Commission will no longer be setting fares

312, 132 F.2d 8 (1942) ; NLRB v. Remington Rand, Inc., 130 F.2d 919, 924–925 (2d Cir. 1942). For reasons stated in text, we deem the assistance of the Commission preferable.

385. Bethlehem Steel Corp. v. Grace Line, 135 U.S.App.D.C. 81, 93, 416 F.2d 1096, 1108 (1969), quoting United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). See also United States v. Ruzicka, 329 U.S. 287, 295, 67 S.Ct. 207, 91 L.Ed. 290 (1946) ; S. S. W., Inc. v. Air Transport Ass'n, 89 U.S. App.D.C. 273, 280, 191 F.2d 658, 664 (1951), cert. denied, 343 U.S. 955, 72 S. Ct. 1049, 96 L.Ed. 1355 (1952).

386. Bethlehem Steel Corp. v. Grace Lines, supra note 385, 135 U.S.App.D.C. at 93, 416 F.2d at 1108. There we directed a court to stay a pending controversy to permit its consideration by an administrative agency, the agency's determination to play an advisory role in the court's resolution of the controversy. Id. at 91–94. 416 F.2d at 1106–1109. See also, e. g., Order of Ry. Conductors v. Pitney, 326 U.S. 561, 567–568, 66 S.Ct. 322, 90 L. Ed. 318 (1946) ; Atchison T. & S. F. Ry v. Aircoach Transp. Ass'n, 102 U.S.App. D.C. 355, 363–364, 253 F.2d 877, 885–886 (1958) ; Capital Transit Co. v. Safeway Trails, Inc., 92 U.S.App.D.C. 20, 23, 201 F.2d 708, 711 (1953).

387. Williams v. Washington Metropolitan Area Transit Comm'n, supra note 16, 134 U.S.App.D.C. at 361–366, 396–397, 415 F.2d 941–946, 976–977. See also Washington Gas Light Co. v. Baker, supra note 356, 90 U.S.App.D.C. at 104–105, 195 F. 2d at 35.

388. See note 16, supra.

389. See text supra at notes 351–356.

390. See text infra at notes 394–403.

for Transit.[391] Thus the rate mechanism cannot be the instrumentality for channeling relief to the busriders, but there are many ways in which the sum owing in restitution could be utilized profitably for the bus-riding public. The choice will become the task of this court after the remand is completed, and we invite the Commission to delve into it on the remand. In light of the fact that the operation of Transit's bus lines is now the responsibility of the Washington Metropolitan Area Transit Authority[392] by terms of the National Capital Area Transit Act of 1972,[393] it would be prudent for the Commission, in framing recommendations as to the precise restitutional relief to be accorded, to consult the Authority and to consider such proposals as it might be inclined to advance.

 In so resolving this case, we have remained heedful of the recent passage of the legislation last mentioned, and the resulting public ownership and operation of Transit's transportation system in the Washington metropolitan area.[394] The takeover of Transit's system in no way affects the disposition upon which we have settled. As we have held, correlative rights and obligations between Transit and its consumers spring from the invalidity of Order No. 773.[395] Those rights and obligations are as litigable as any others, and their enforceability against Transit survives the metamorphis of its transportation system from private to public ownership. While Transit's operating franchise ended immediately upon public acquisition of its facilities,[396] its corporate existence outlives that event,[397] and so also do its unassumed liabilities.[398] And while the Commission can no longer set fares for transit service,[399] its jurisdiction to finish existing litigation—otherwise than by ratemaking—remains intact.[400] Our disposition neither requires nor tolerates

391. See text *infra* at notes 394–403. Our decision today in Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, disposes of part of the gain from the transfer of Transit's depreciable assets below the line by requiring that $252,688 of that gain be credited to Transit's riders' fund. See Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, Part VI at note 173.

392. See note 394, *infra*.

393. Pub.L. No. 92–517, 86 Stat. 999 (1972). See text *infra* at notes 394–403.

394. The Act gave congressional consent to amendments to the Compact, *supra* note 12, empowering the Washington Metropolitan Area Transit Authority to "acquire the capital stock or transit facilities of any private transit company" and to "perform transit service . . . with transit facilities so acquired. . . ." § 101(a)(1), 86 Stat. 1000 (1972).

395. See text *supra* at notes 366–376.

396. National Capital Area Transit Act of 1972, § 102(b), 86 Stat. 1001 (1972).

397. The National Capital Area Transit Act of 1972, § 102(d), 86 Stat. 1001 (1972), provides that Transit "may . . . continue to exist as" a District of Columbia Corporation and that "[n]othing in this Act shall be construed so as to cause or require the corporate dissolution of" Transit.

398. It is well-settled that a cause of action in restitution is not terminated by the death of the transferor of the benefit or by the death of the recipient of it. Restatement of Restitution § 149(a) (1937). Applying this principle to the corporate "person" here, it is clear that Transit's restitutional obligations will survive the demise of its operating franchise.

399. This follows from the Transit Authority Compact, *supra* note 12, which in art. XI, § 51, directs the Washington Metropolitan Area Transit Authority (Authority) to provide for the performance of transit service, with facilities owned or controlled by it, by contract with private transit companies, railroads or other persons; and in art. XIII, § 60, confers upon the Authority's board of directors exclusive jurisdiction to fix the rates and fares to be charged for service performed by transit facilities owned or controlled by the Authority, and provides that the Commission "shall have no authority with respect thereto, or with respect to any contractor in connection with the operation by it of transit facilities owned or controlled by the Authority."

400. The Transit Authority Compact, *supra* note 12, in art. XIII, § 59, provides that

further rate-making respecting the matters at issue,[401] but only restitutional activities occasioned by invalid ratemaking in the past.[402] Our disposition, too, leaves interested parties free to litigate to a complete and final conclusion the rights and obligations we have identified.

Order No. 773 is set aside. The record is remanded to the Commission for further proceedings consistent with this opinion. Our jurisdiction over the case is retained in full.[403]

So ordered.

## APPENDIX

## COMMISSION'S STATEMENT AS TO HISTORY OF REAL PROPERTIES PURCHASED AUGUST 15, 1956, BY D.C. TRANSIT SYSTEM, INC., BUT THEREAFTER TRANSFERRED TO NONOPERATING STATUS

1. *M Street Shops*, 3222 M Street, N.W. (now known as M Street Estates, Inc.). This property was used as a general streetcar repair shop until June 30, 1963, when it was placed in a non-operating (below-the-line) status. From that time until May 31, 1964, it was used for storage of obsolete equipment. On May 31, 1964, title to the property was transferred to M Street Estates, Inc., which is wholly-owned by D. C. Transit of D.C. Since its incorporation, $1,106,210 has been spent on converting it into rental space for the General Service Administration. For the year 1969, M Street Estates had a net income of

"[e]xcept as provided herein, this Title"—the Transit Authority Compact in its entirety—"shall not affect the functions and jurisdiction of" the Commission "as granted by Titles I and II of this Compact"—the Transit Regulation Compact in its entirety—"over the transportation therein specified and the persons engaged therein and the Authority shall have no jurisdiction with respect thereto." The National Capital Area Transit Act of 1972 did not authorize any change in this provision, nor did it disturb the Commission's existing jurisdiction over any carrier which furnishes service otherwise than as a contractor for operation of transit facilities owned or controlled by the Authority. The restitutional rights and liabilities remaining at stake in the case at bar arose, of course, while Transit operated as an individual carrier.

401. See text *supra* at notes 351–356.

402. See text *supra* at notes 366–376.

403. Perhaps unnecessarily, but out of an abundance of precaution, we point out that the takeover pursuant to the National Capital Area Transit Act of 1972 does not moot the issues which the proceedings on remand, and thereafter in this court, contemplate. While any question as to the continuing operability of an unsuperseded fare order might become moot at the point of takeover—a matter on which we express no opinion—no such question arises in this case. Order No. 773 has long since been displaced by later fare orders. See note 354, *supra*, and accompanying text. We have held that Order No. 773 is invalid and that it never had a valid operation. See text *supra* at notes 351–356. We reiterate that rights and liabilities were generated during the past era of the order's actual operation, the amounts of which await precise determination. See text *supra* at notes 366–376. The issues in that regard are not moot. See Southern Pac. Co. v. ICC, 219 U.S. 433, 452, 31 S.Ct. 288, 55 L.Ed. 2d 283 (1911); Curcio v. United States, 354 U.S. 118, 127–128 n, 7, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); Bebchick v. Public Serv. Comm'n, *supra* note 185, 115 U.S.App.D.C. at 218–219, 318 F.2d at 189–190; Associated Press v. FCC, 146 U.S.App.D.C. 361, 365 n. 29, 452 F.2d 1290, 1294 n. 29 (1971). Moreover, there are also special funds, including one in this very case, which have been set up under Commission control for purposes that remain unfulfilled. See, e. g., Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 3; D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 354, 85 P.U.R.3d at 13; D.C. Transit Sys., Inc. (Order No. 773), *supra* note 311, 72 P.U.R.3d at 133–134. See also D.C. Transit Sys., Inc. (Order No. 952), *supra* note 211. The question of disposition of those funds—which the exigencies of restitution could affect—is not moot. Market Street Ry. v. Railroad Comm'n, 324 U.S. 548, 553, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). In sum, the need to resolve these problems keeps this litigation very much alive for the further proceedings this opinion envisions.

$74,519.64 and its retained earnings were $348,831.95 at December 31, 1969.

2. *Grace Street Shop* (now known as Grace Street Estates). The property housed the way department storeroom, an electrical repair shop and a garage for trucks until September 30, 1963, when it was placed in a nonoperating (below-the-line) status. From that time until April 30, 1970, it was empty and unused. On April 30, 1970, title to the property was transferred to Grace Street Estates, a wholly-owned subsidiary of D. C. Transit System, Inc., of D.C.

3. *General Office Building, 3600 M Street, N.W.* (now known as 3600, Inc.). This property housed D. C. Transit's officers at the time D. C. Transit came into existence, but later was partially rented to outsiders. After being placed in a non-operating (below-the-line) status on January 1, 1964, the building was rented mainly to outsiders but continued to house a portion of the D. C. Transit officers, around 20% of the building space for a while, and then to 15%. On December 31, 1967, title to the property was transferred to 3600 Inc., a wholly-owned subsidiary of D. C. Transit System, Inc. of D.C. Since being incorporated, the sum of $115,968 has been invested in office renovations and it is now being rented 100% to outside parties. In the year 1969, 3600 Inc., had net income of $8,486.29. Its retained earnings stood at $58,511.32 on December 31, 1969.

4. *Central Garage on Georgia Avenue, N.W.* (now known as Georgia Avenue Estates). This building was used as a bus garage until it was placed in a non-operating (below-the-line) status on September 30, 1958. After being placed below-the-line, it was leased to the Post Office Department. On May 31, 1964, title to the property was transferred to Georgia Avenue Estates, Inc., a wholly-owned subsidiary of D. C. Transit System, Inc., of D.C. Since then some $19,657 has been spent on building improvements while at the same time the Post Office Department has continued to be its tenant. The net income of Georgia Avenue Estates for 1969 was $29,547.36. Its retained earnings stood at $118,049.85 on December 31, 1969.

5. *Northeastern (Eckington) Carhouse* (now known as Fourth Street Estates). This property was used as a carhouse until streetcar service was discontinued in that area of the city on September 7, 1958. After that, the building remained empty and unused until May 31, 1959 at which time it was placed in a non-operating (below-the-line) status. As non-operating property, it was rented to outsiders. On May 31, 1964, title to the property was transferred to Fourth Street Estates, Inc., a wholly-owned subsidiary of D. C. Transit System, Inc., of D.C. Subsequently, the sum of $472,628 was spent on building improvements. It is currently being leased as a warehouse to outside parties. In the year 1969, Fourth Street Estates realized net income of $15,804.66 and at year end (1969) its retained earnings stood at $22,030.92.

6. *Navy Yard Carhouse* (now known as L Street Estates). This property was used as a carhouse until the last street cars were discontinued on January 28, 1962. Obsolete equipment was then stored there. On June 30, 1963, the property was placed below-the-line (in non-operating status). It continued as a storehouse for obsolete equipment until the date of its incorporation, May 31, 1964. On that date title to the property was transferred to L Street Estates, Inc., a wholly-owned subsidiary of D. C. Transit System, Inc., of D.C. $392,384 has been spent on converting the carhouse to warehouse and office space for outside rental since its incorporation. 1969 net profits realized by L Street Estates were $62,391.74. Its retained earnings at December 31, 1969 were $274,281.18.

7. *Georgia and Eastern Avenue Terminal.* This property was used jointly as a rail terminal and bus terminal. Its use as a rail terminal was discontinued on January 3, 1960 and its use as a bus terminal ended on September 11, 1960.

It remained unused thereafter. On October 31, 1960, it was placed in non-operating (below-the-line) status and subsequently sold, on December 21, 1962, to Joseph Ginsberg.

8. *Southern (7th Street) Carhouse.* This southeast property was used as a carhouse until it was sold on January 16, 1959 to the D. C. Redevelopment Land Agency.

9. *Fourth Street Shops.* This southwest property was used for general streetcar and bus repairs until it was sold together with the Southern Carhouse on Jaunary 16, 1959 to the D. C. Redevelopment Land Agency.

10. *Trinidad Garage.* This property was used as a bus garage until September 10, 1966. It was vacant thereafter until May 8, 1970, when sold to the D. C. Redevelopment Land Agency.

11. *Eastern Garage.* This property was used as a carhouse until December 31, 1961. It then became a bus garage and was used for that purpose until September 10, 1966, when it was vacated. It has been empty ever since although still classified as operating property on the company books.

12. *Brookland Garage.* This property was a bus garage until September 10, 1966. Since that date retired buses have been stored there. It remains in operating status on the books to this date.

MacKINNON, Circuit Judge, concurring in part and dissenting in part:

## I. Summary and Introduction

The foregoing opinion addresses the question of whether the difference in fair market value over book value of certain parcels of real property including both depreciable (buildings and equipment) and nondepreciable (land) segments, which had appreciated in value during their inservice life, should inure to the benefit of the farepayers or to the benefit of the investors of Transit in the ratemaking decision, when transferred from operating ("above the line") to non-operating investment status ("below the line"). The question arises on review of Order No. 773 in which the WMATC ("Commission") ordered a fare increase without consideration of the transfer of these appreciated properties. The majority concludes that this constituted error and accordingly sets aside the order.

The initial question of whether such transfers from operating to non-operating status give rise to any cognizable gain in the ratemaking decision is resolved in the companion opinion—Bebchick v. WMATC, No. 23,720, at Part III, 158 U.S.App.D.C. ——, 485 F.2d 868 (hereinafter *Bebchick*). The conclusion reached therein is that the transfer of the properties from above to below the line resulted in ratemaking consequences identical to those of an outright sale of the same assets. While in a different context and for different purposes such treatment would raise serious questions, I accept it for our present purposes.

In considering the competing claims of Transit's investors and consumers for the benefits derived from these transfers, the majority concludes that the farepayers have the superior claim in all instances. It is my view, with respect to the depreciable properties, that the majority is on solid ground in awarding the gain to the farepayers, at least to the extent of the depreciation reserves that are maintained in respect of the property.[1] While I have some question as to the farepayers' inexorable right to amounts over and above the depreciable cost of the asset,[2] I concur in awarding them the total appreciated gains under the circumstances present here.[3]

---

1. Throughout this opinion, when reference is made to the farepayers' right to receive gains to the extent of the "depreciation reserves," it is assumed that any depreciation deficiency due on the asset because of its premature retirement is first eliminated and the investors are compensated to that extent. *See also,* note 39, *infra.*

2. *See* Part II B 2 a(2), *infra* at 840.

3. *See* Part II B 2, *infra* at 838.

But the issues surrounding the appreciated value of the nondepreciable assets (the land itself), raise different and more difficult questions.

While the majority admits that a risk of loss analysis is inapplicable here due to the inevitable appreciation of urban land values, it blithely concludes without close analysis that the rules which place the risk of loss on farepayers as to depreciable property are equally applicable to nondepreciable assets. I would like to disassociate myself from such dangerous dicta and will attempt to point out the flaws in the majority's reasoning. There *is* a rational basis upon which to distinguish between depreciable and nondepreciable assets in this context and the Commission's application of an accounting practice which reflects this should be upheld.

Aside from the risk of capital loss, the other principal reason the majority advances for its conclusion with respect to the land is a basic feeling that the equities of the situation, in light of the history and circumstances of Transit and its acquisition of the properties in question, require any "loose gains" coming into the company to be credited to the consumers. This the majority frames in terms of the rule "benefit follows burden," [4] but admits that this consists in "determining where the equities lie." *Supra* at 811.

Most vital of these equities in the majority opinion is the fact that the land was intimately related to the conversion program from a street railway to an all-bus operation, and, since the extraordinary conversion costs were borne by the farepayers, any extraordinary gain resulting therefrom should benefit the farepayers and go toward alleviating their conversion burdens.[5] Since the conversion program was a *sine qua non* of the resultant gains, the majority observes, an overriding equitable consideration arises with respect to these conversion-related properties. While this has a surface attraction, there are some problems with its application here and with its interrelation with the other relevant policies.[6] Yet, even assuming *arguendo* that the majority is completely correct in its determination that equities surrounding the conversion can constitute a dispositive equitable factor, it does not extend, of course, to those properties not in any way related to the conversion program. It is with respect to those properties, the non-related, non-depreciable assets, that the greatest difficulty arises in adopting the position of the majority. Here the legal grounds for awarding the gains to the farepayers become most attenuated.

The underlying basis for the majority's equitable approach is that in light of the demise of the "fair value" theory of ratemaking [7] investors are not considered to have any protectable constitutional interest in the actual assets of a publicly regulated utility but rather are entitled only to a fair return on their initial investment.[8] Therefore, arguably the logical extension of this is that any gains on disposal of appreciated properties are to be apportioned as between the farepayers and the investors solely on an equitable basis in light of all the relevant facts and circumstances. Although the question is not without difficulty, it is my view that this approach is incorrect as applied in the majority

---

4. *Supra* at 808. As discussed in my Part II B 2 c, *infra* at 843, this is to a considerable extent merely a restatement of the majority's risk of capital loss analysis. The better basis for its equity balancing method is the demise of the fair value system as discussed in Part III of the majority opinion, *supra*.

5. For discussion of this conversion-relationship notion, *see* Part II B 2 a, *infra* at 838.

6. *See* Part II C *infra* at 844.

7. *See* Part II C, *infra* and Part II of the majority's opinion, *supra*.

8. That is, the figure used in fixing the rates is the original cost of the asset rather than the appreciated value thereof.

opinion. This constitutional policy sets only the *outer dimensions* of permissible ratemaking and is not a license for us to overturn Commission actions in conformance with accepted accounting procedures whenever we feel the equities tend to support a contrary result. It is thus my conclusion that the policy of judicial deference to agency actions requires that we uphold this order in respect to the land as not arbitrary and capricious insofar as it distinguishes between depreciable and nondepreciable assets.

## II. Nondepreciable assets

### A. The example of depreciable assets

Much of the rationale behind the majority's view that the consumers would be liable for any capital loss on the land and therefore be entitled to any gains is derived by analogy to its analysis of the depreciable assets.

There is a respectable amount of authority both inside and outside this jurisdiction which supports the majority's disposition of the depreciable assets. The basic notion is that since the farepayers must make good the shareholders' investment on depreciable properties through the depreciation reserve, and bear the risk of loss through obsolescence in that they must make up for the underdepreciated cost of any prematurely retired asset, if the asset should be sold for a profit they equitably should

benefit at least to that extent. If it is sold for less than book value they must make up the difference between that amount and the accumulated depreciation to date. Therefore, the reasoning goes, if it is sold at a profit it is only equitable that he who bears the risk of loss should similarly reap the gain.

The fundamental premise of this principle is that the farepayers *do in fact bear the risk of loss of obsolescence.* In Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 188 F.2d 11 (1950), cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951), this court adopted this view and held, with respect to depreciable properties, that the farepayers may be charged with the unrecovered cost [9] if the investors have not been compensated in some other way.[10] A similar result was reached by Justice Murphy of the Minnesota Supreme Court in Minneapolis Street Ry. v. Minneapolis, 251 Minn. 43, 86 N.W.2d 657 (1957) which held, citing *Baker* with approval, that the obsolescence loss occasioned by abandoned streetcar facilities must be borne by the farepayers.[11]

When the retirement of the assets has resulted in a *gain,* a number of courts outside this jurisdiction have credited the gain to the depreciation reserve to offset the farepayers' burden of making good the investors' unrecovered costs,[12] and more importantly, there is ample authority within this jurisdiction for such treatment. In D. C. Transit System,

---

9. The method the court adopted to "charge" the farepayers was to leave the retired asset in the rate base thus increasing the return to the investors at the farepayers' expense. Under normal circumstances assets not "used and useful" in the company's operations are *not* included in the rate base.

10. The two ways in which investors could have been already compensated for the risk are: (1) if through any accounting method (such as amortization) the investors have already been compensated; and (2) if the investor has been compensated by a higher rate of return because of assuming the risk. Minneapolis Street Ry. v. Minneapolis, 251 Minn. 43, 86 N.W.2d 657, 668 (1957).

11. The method adopted by the court here for putting the loss on the farepayers was slightly different than in *Baker. Cf.* note 9, *supra.* The retired asset was not included in the rate base, but the company sought to amortize the loss over a 10-year period as an operating expense. "But in both cases [*Baker* and *Minneapolis*] the fundamental issue is whether the consumer or the investor will bear the loss." 86 N.W.2d at 667.

12. In re Revision in Rates Filed by Plainfield-Union Water Co., 57 N.J.Super. 158, 154 A.2d 201, 205, 211 (1959) ; Minneapolis-Street Ry. Co., 31 P.U.R.3d 141 (Minn. Ry. & Warehouse Comm'n 1959) ; Wyoming Gas Co., 40 P.U.R.3d 509 (Wyo. Pub. Serv. Comm'n 1961).

Inc. (Order No. 4577) 30 P.U.R.3d 405 (D.C.Pub.Utils.Comm'n 1959), the PUC noted that under its Uniform System of Accounts a net profit on the sale of depreciable improvements should ordinarily be credited to the depreciation reserve as salvage (and thus benefit the farepayers).[13] In D. C. Transit System, Inc. (Order No. 245), 48 P.U.R.3d 385 (WMATC 1963), "the Commission recognizes that 'gains' may be experienced on disposal of depreciable items and these are indeed used as offsets to depreciation under the heading of 'salvage.'" 48 P.U.R.3d at 403–404. Similarly, in D. C. Transit System, Inc. v. WMATC, 121 U.S.App.D.C. 375, 350 F.2d 753 (en banc, 1965), this court decided that the Commission's decision to benefit the farepayers with the gains from disposal of depreciable properties to the extent of the depreciation taken and beyond was reasonable in light of the peculiar equitable circumstances in that the farepayers were required to bear the enormous conversion costs that occasioned the gains realized.[14] The Commission has recently stated that "there is no question that, when depreciable operating property is sold and a gain is realized, the gain should be used to reduce the depreciation expenses which ratepayers have paid but which the company, because of the gain, does not actually incur." D. C. Transit Sys., Inc. (Order No. 1090), 85 P.U.R.3d 508, 513 (WMATC 1970).

Thus with regard to depreciable properties the approach adopted by the majority is well-supported and equitable but this does not justify a procrustean attempt to force nondepreciable assets into the same mold.

B. Nondepreciable assets

1. Risk of capital loss

a. Precedents

Within the District, a number of administrative decisions have uniformly held to the contrary of the analysis adopted by the majority. This is admitted by the majority[15] but it is claimed that the administrative approach was adopted without critical analysis. Outside the District, there is a paucity of cases and the few that are cited cannot directly support the action taken here.[16] The majority observes the dearth of decided cases and seems to take this as a "license" to deal with the question as if writing on a clean slate. It would appear, however, that the lack of cases on point is probably more indicative of the fact that no one previously has ever imagined of or argued for such a novel approach with respect to nondepreciable assets.

Within the District, the issue has been mentioned in administrative opinions but we have never directly considered it.[17] Under both the PUC and WMATC, profits on sales of land have been treated as "a proper credit to earned surplus" and thus as benefiting the investors. D.C. Transit Sys., Inc., (Order No. 4577), 30 P.U.R.3d 405, 409 (D.C.Pub.Utils, Comm'n 1959); D.C. Transit Sys., Inc. (Order No. 563) 63 P.U.R.3d 32, 34 (WMATC 1966). More directly on point is D.C. Transit Sys., Inc., (Order No. 245) 48 P.U.R.3d 385

---

13. However, special circumstances dictated a sharing between consumers and investors. We affirmed in D. C. Transit Sys., Inc. v. P. U. C., 110 U.S.App.D.C. 241, 292 F.2d 734 (1961). See discussion infra, Part II B 2 a(2) at 840.

14. See text accompanying note 55 supra, and further discussion infra, Part II B 2 a at 838.

15. Supra at 798.

16. Aside from the cases discussed infra, the petitioners loosely cite Baker and Minne-

apolis, supra note 11 (petitioners' brief at 18), for their position on the land. However, as effectively pointed out in Respondent's brief (at 12–13) these cases dealt only with depreciable properties (plant and equipment) and have no applicability to nondepreciable real estate.

17. The majority correctly states that none of our decisions upholding Commission orders can be interpreted as a decision on the merits of this issue.

(WMATC 1963) in which an argument very similar to the approach adopted by the majority here was advanced to the Commission and rejected by it. In that case it was argued that gains realized on the sales of certain pieces of land might be used to offset some of the losses on the premature retirement of rail facilities borne by the farepayers. In clearly holding to the contrary the Commission stated:

> While the ratepayers may have a claim to the depreciable property, at least to the extent of the depreciation reserved, *no such claim can be directed to land.*

48 P.U.R.3d at 399 (emphasis added).[18] And further:

> If land becomes of no further use and is disposed of at a profit, the investor is entitled to the profit; or, if at a loss, the investor must suffer the loss.

*Id.* at 400.[19]

Outside this jurisdiction, I agree with the majority[20] that the cases can be read only to stand for the proposition that the benefit of capital gains accompanies the risk of loss. In New York Water Service Corp. v. Public Service Comm'n, 12 A.D.2d 122, 208 N.Y.S.2d 857 (1960) affirming New York Water Service Corp., 7 P.U.R.3d 32 (N.Y.Pub. Serv.Comm'n 1955), the court upheld a determination by a regulatory commission which passed on to the consumers a profit reaped on the sale of land. The controlling reason was that under the system of accounting adopted by that agency, any *loss* on a sale of land was required to be debited to the depreciation reserve and thus charged to the consumers. "The utility is thus protected from a loss in the sale of land in its operations; it seems reasonable it should pass on a profit to the consumer." 208 N.Y.S.2d at 863–864. Thereafter in Lexington Water Co., 72 P.U.R.3d 253 (Ky.Pub.Serv.Comm'n 1968), the same rule was applied by the Kentucky regulatory commission, citing *N.Y. Water Service.* "If it is proper to recover losses of non-depreciable property through amortization, then conversely it should be proper to amortize gain on such property." 72 P.U.R.3d at 259–60. Yet this decision was *reversed* by the reviewing court on the grounds that *N.Y. Water Service* was decided as it was *only* because of its unique accounting procedures—procedures absent in the Kentucky case.[21] The court believed that the risk of gain or loss had in fact been borne by the *investors.* Lexington v. Lexington Water Co., 458 S.W.2d 778 (Ky.1970). This case can, then, be cited in direct opposition to the approach adopted by the majority:[22]

> Profit made from the sale of non-depreciable land no longer used in serving customers is not an ingredient to be considered in fixing rates. The customers had no interest in the profit realized on the sale—it belonged to the stockholder.

---

18. The Commission's reasoning was correct simply *because* land is nondepreciable.

19. It is true that the Commission cited Board of Pub. Util. Comm'rs v. New York Tel. Co., 271 U.S. 23, 32, 46 S.Ct. 363, 70 L.Ed. 808 (1926) in support of this analysis. While the majority's criticism of that case as standing for this proposition has my concurrence, *see* note 82 *supra,* it nevertheless appears that the Commission is correct and for reasons discussed *infra* that its conclusion can stand despite this faulty premise.

20. *Supra* at 798.

21. The Kentucky agency had adopted a system of accounts providing for the charging of losses and for the crediting of profits on land sales, not to consumers, but rather to the utility's earned surplus account. 458 S.W.2d at 779.

22. And note especially that this system was adopted in spite of the fact that Priest lists Kentucky as an original cost jurisdiction. 1 A. Priest, Principles of Public Utility Regulation 145–146 (1969). This figures importantly in evaluating the "fair value" analysis of the majority at Part III *supra. See,* Part II C *infra.* Such accounting procedures are in fact compatible with original cost doctrines such as, prevail in our jurisdiction.

*Id.* at 780. The majority also cites Columbus Gas & Fuel Co. v. Public Utils. Comm'n, 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327 (1934) as indicating that sudden losses in market value of land may conceivably be borne by consumers. However, the Supreme Court denied the claim because no such risk of value diminution from abandonment was imminent. Yet it appears that the Court would have allowed a system which treated land as a "depreciable" asset for all purposes (*see* note 25, *infra*) in which case the risk of loss would in fact be on the farepayers.

Therefore, while it is clear that the majority is correct in reading these cases as standing for "the broader principle that the benefit of a capital gain follows the risk of capital loss."[23] it clearly fails to recognize the importance of the applicable system of accounting and the Commission's practice and pronouncements in determining where in fact these risks do lie.

b. Who in fact bears the risk of loss?

(1) The Commission's pronouncements

It is clear that under the Commission's Uniform System of Accounts, land is treated as a nondepreciable asset and any gain or loss is a risk not of the farepayers, but of the investors.[24] Certainly the Commission could have adopted a different system placing the risk of loss on the farepayers if it had so desired.[25] Yet the Commission has repeatedly said it is the investor's risk of loss. D.C. Transit Sys., Inc., (Order No. 245) 48 P.U.R.3d 385, 399, 400 (WMATC 1963); D.C. Transit Sys., Inc. (Order No. 4577) 30 P.U.R.3d 405,

409 (D.C.Pub.Utils.Comm'n 1959); D.C. Transit Sys., Inc. (Order No. 563), 63 P.U.R.3d 32, 34 (WMATC 1966); *see also* Respondent's brief at 9–10 and the Commission's brief in *Bebchick* at 32.

It is reasonable to adopt such an accounting method and as such it is beyond our power to overturn it, especially in light of consistent Commission adherence thereto. The Commission (as is usual with most regulatory agencies) has express statutory authority to establish uniform accounting rules[26] and such rules are controlling unless clearly arbitrary and capricious. D.C. Transit Sys., Inc. v. P.U.C., 110 U.S.App.D.C. 241, 292 F.2d 734 (1961). Public utility regulation cases are replete with recitations of the principle that deference is to be accorded an agency's accounting treatment of various transactions unless clearly unreasonable. *See, e. g.*, American Telephone & Telegraph v. United States, 299 U.S. 232, 236–237, 57 S.Ct. 170, 81 L.Ed. 142 (1936); Northwestern Electric Co. v. FPC, 321 U.S. 119, 124, 64 S.Ct. 451, 88 L.Ed. 596 (1944); Arkansas Power & Light Co. v. FPC, 87 U.S.App.D.C. 385, 185 F.2d 751 (1950); *see also infra* at 844–845. Accounting rules themselves reflect basic policy judgments carefully arrived at and should not be hastily overturned.

The reasonableness of a system of accounting which treats land as nondepreciable seems manifest. Land does not wear out in the conventional sense of buildings and equipment. Neither it is a wasting asset such as resources subject to depletion allowances. Moreover while there obviously may be exceptions, as a general rule it is extremely unlikely that the fair market value of land in metropolitan areas would decrease below

---

23. *Supra* at 798.

24. "If land becomes of no further use and is disposed of at a profit, the investor is entitled to the profit; or, if sold at a loss, the investor must suffer the loss." D.C. Transit Sys., Inc. (Order No. 245) 48 P.U.R.3d 385, 400 (WMATC 1963).

25. A system which allowed for "depreciating" land and charging the depreciation to

the farepayers was apparently permissible in Columbus Gas & Fuel Co. v. Pub. Util. Comm'n of Ohio, 292 U.S. 398, 410–411, 54 S.Ct. 763, 78 L.Ed. 1327 (1934).

26. Under the old PUC, the Code so provided. 43 D.C.Code §§ 309, 310, 314 (1951); *see* D.C. Transit Sys., Inc. v. P.U.C., *supra* note 13.

cost over a period of time.[27] This general stability of land values insures the integrity of the shareholders original investment in the vast majority of situations and it is just for that very reason that it is a widespread practice among regulatory agencies to treat land as nondepreciable. Under these circumstances it seems that the Commission's decision to treat land as a nondepreciable asset and to credit or debit any gain or loss on disposition to the earned surplus account is eminently reasonable and should be sustained. It certainly is a settled principle that land is nondepreciable and to call this is a "mistaken notion" [28] is wholly unjustified. It is familiar law that great deference is to be accorded consistently applied administrative decisions and interpretations of its own rules and regulations and here, as the majority admits,[29] the administrative decisions have uniformly treated gain or loss on land as a concern solely of the utility's investors.

### (2) Criticism of the majority's conclusion in this regard

How then does the majority arrive at the conclusion that the risk of loss on land dispositions is borne by the farepayers? The answer is not completely clear,[30] but essentially the majority concludes that, in spite of what the Commission has done in the past and says it will do in the future, if faced with a concrete situation in which land becomes obsolete for the company's purposes and the market value drops .below cost, if sold at a loss the Commission will place the burden of making good the original investment on the consumers just as is done with depreciable properties for

which insufficient depreciation has been taken due to unforeseeable obsolescence.

The majority repeatedly speaks of "obsolescence and declining markets" with respect to land.[31] However, the concept of obsolescence in conjunction with land simply does not work. The truth of the matter is that if land is sold at a loss due to sudden obsolescence the loss falls on Transit's investors—and statements such as that in the text, *supra* at note 322, are simply wrong *as to land*. The only authority to the contrary is distinguishable easily on the basis of different accounting systems and different administrative practices in other jurisdictions.[32] There is no depreciation reserve mechanism as to land whereby farepayers must make good the original investment as in the case of depreciable properties—and it is the fact of *depreciation* that dictates the farepayers' burden as to depreciable properties, *not* the fact of possible fluctuations in market value. The hypothetical on pages 807–808 of the majority opinion insofar as it deals with land is completely erroneous. It simply states *ipse dixit* the startling conclusion that it is "the notepayers' burden to compensate [investors] for the loss on their investment in the land." For authority, footnote 194 refers to cases (text and cases at footnotes 211–218) that deal exclusively with *depreciable* property and are ·of no authority for the proposition stated. Repeatedly the majority speaks of "obsolescence" as to land but refers the reader only to cases involving obsolescence as to *depreciable* property.[33] Such citations beg the very question before us which is *whether or not* the treatment accorded depreciable property should be extended as well to nondepreciable as-

---

27. This is also observed in today's companion cases Nos. 23,720 and 24,398.

28. Text accompanying note 310, *supra*.

29. *Supra* at 798.

30. The majority refers to both depreciable and nondepreciable assets in the same breath with respect to risk of loss. *See, e. g., supra* at 809–811. However, on

analysis, the only real threat of loss claimed by the majority as to *land* is declining market value due to obsolescence.

31. *See e. g., supra* at 807–808, 810–811.

32. *See supra* at 834–836.

33. The identical cases are cited for both nondepreciable and depreciable assets. *Compare* note 194 *with* note 192 *supra*.

sets. While there might be some "inside information" that is not apparent, it stretches credulity to suggest that the Commission would depart from its own system of accounting and repeated past administrative pronouncements to place the risk of decline in market value of land through obsolescence on the farepayers. And to use that as an ostensible basis for awarding the farepayers the gains on that property is tortured logic at best.

The majority does conclude that even though this analysis would support an award of the gains to the farepayers if there were a palpable risk of declining markets, that risk is not present here.[34] Thus it appears that the "obsolescence" of which the majority speaks is in reality only the threat of declining market values. And I must repeat that this again demonstrates that "obsolescence" is a concept applicable only to depreciable property in this context. It is not the risk of sudden declines in market value of *depreciable* property that dictates the award of gains to the farepayers, but rather the *fact* of depreciation, in that farepayers are required to make good the *cost* investment of the prematurely retired asset through the depreciation mechanism. And this in turn is founded, of course, on the fact that depreciable property invariably wears out or is consumed. This simply has no application to nondepreciable property and it is undisputed that land is nondepreciable. Accounting principles are not conjured up out of the air, but are themselves representative of studied policy judgments. As such they deserve some respect and where an administrative agency consistently adheres to them,

that should not be the subject of *de novo* judicial examination.

Moreover, the majority does not even maintain internal consistency. Even while disclaiming any reliance on "risk of capital loss" as to land in this case due to the inevitability of land value appreciation,[35] the majority seems unable to refrain from further gratuitous reference to that doctrine to lend support to its result.[36] It also reappears in discussing the supposedly distinct ground of "benefit follows burden" (the dispositive ground in the majority's opinion) and figures importantly there, despite the prior disclaimer of reliance thereon for the purposes of this case.[37]

### 2. Equities

Since notions of risk of loss cannot and do not support the majority's disposition of the gains from land, what other grounds are advanced in the opinion? The second and controlling "doctrinal consideration" in the majority opinion is termed "economic benefit follows economic burden". The makeup of these "burdens" is crucial. A large part of this consists of enumerating the various equities of the farepayers in light of the history and circumstances of Transit.[38] My brief analysis of these equities follows.

#### a. Conversion-relationship

Running all through the opinion is a basic equitable notion that gains on properties which are intimately related to the conversion to an all-bus system undertaken by Transit as a condition of its charter, should inure to the consumers who are bearing the enormous costs of the conversion program. It is undis-

34. On the other hand, the argument can always be made that just because most land values have consistently risen in our times, that does not mean they will invariably continue to do so. And there are conceivable hypothetical situations in which, for example, certain easements useful and valuable while in service, become totally worthless when transferred to nonoperating status (*e. g.,* track easements down the center of a street).

35. I find it inapplicable on more fundamental grounds.

36. *See, e. g.,* text accompanying notes 325, 327, *supra; see also* Part II B 2 c, *infra* at 843.

37. *See* Part II B 2 c, *infra* at 843.

38. *But see Id.* An equally large part consists of a restatement of the first "doctrinal consideration."

puted that consumers are bearing the $5–15 million cost of the conversion. In the majority opinion, this fact leads to the conclusion that "the crowning consideration [in totaling the various equities] is the incontrovertible fact that the conversion, at full cost to the farepayers, was the *sine qua non* to release of value properties from operating roles in the transportation scheme for uses in non-transportation ventures." *Supra* at 816. While the proximity of the relationship of the land to the conversion process is an important equitable factor, it is *not* a legally sufficient ground in and of itself to support the majority's result. To dispel all such doubt, the following analysis seeks to trace the proper role of "conversion-relationship" in light of past precedents.

### (1) Precedents

This concept is derived from cases *in this jurisdiction* indicating that with respect to *depreciable* properties for which obsolescence losses are incurred due to the conversion, consumers should be allowed to *share* equitably in the proceeds on disposition. How this principle developed and to what extent it is applicable here requires a close analysis of the cases in which it has appeared.

It first arose in D.C. Transit Sys., Inc., (Order No. 4577) 30 P.U.R.3d 405 (D.C.Pub.Utils.Comm'n 1959). In that case there were profits on the sale of conversion-related properties over and above the depreciable cost of the assets.[39] The PUC noted that under its Uniform System of Accounts, *all* gains normally should be credited to the depreciation reserve as salvage (to benefit the consumers). *Id.* at 410. Then it observed that this was a highly unusual situation in that there were gains over and above the amount needed to retire the original cost of the assets and therefore departure from the Uniform System of Accounts was deemed warranted. The company sought the "over and above" gains in total, but the PUC noted the compelling equity of the close relation of the gains on these properties to the conversion program.[40] This is somewhat odd because the PUC really approached the question "backwards." That is, since the Uniform System of Accounts required *all* gains to go to the farepayers, why should it not have searched for some equities on the side of the *investors* rather than the farepayers. Somehow the PUC seemed to adopt a presumption that all "over and above" gains should now go to the investors, contrary to its own Uniform System of Accounts.

Nevertheless, this approach was later cited by this court sitting *en banc* as a valid method of determining when gains

---

39. Throughout this opinion, the term "over and above" gains will be used to refer to gains realized on the disposition (or transfer below the line) of a depreciable asset, over and above the depreciation reserves (that amount contributed by the farepayers toward the depreciation of the asset) and assumes that any depreciation deficiency due to premature retirement of the asset is also covered by the gains. Thus it is profit over and above the total original depreciable cost of the asset.

40. In ordering Transit to allocate the proceeds of the sale in the manner described, the PUC declared:
 "In light of the franchise of the company requiring a gradual program of conversion from railway to bus operations over a 7-year period from July 24, 1956, we are unable to disassociate the instant transaction from the imminent retirement of all rail property under the mandate contained in the franchise. We cannot ignore the probability that full provision for depreciation will not have been provided when the rail facilities are abandoned and retired by reason of conversion. The company has consistently taken the position that any retirement loss in this connection should be recovered by charges against the customers, and the staff has heretofore indicated its agreement. However, if the customers are to be required to bear the burden of extraordinary retirement losses incident to the whole conversion program, it appears equitable that they should share, at least to some extent, in extraordinary retirement gains of the nature here under consideration."
 D.C. Transit Sys., Inc., 30 P.U.R.3d 405, 412 (D.C.Pub.Utils. Comm'n 1959).

on depreciable property (presumably over and above the depreciation reserve although this is not clear) can be·applied to offset other charges arising out of the conversion. In that case the question was whether a profit on the depreciable portion of an asset [41] could be used to offset an obsolescence charge for the retirement of a different asset, underdepreciated due to the conversion. The court seemed to say the profit on one piece of depreciable property could not be used to offset the obsolescence deficiencies on another asset unless the requisite relationship to the conversion were established. 350 F.2d at 775–776. The court remanded to the Commission to determine whether the profit-yielding property was in fact conversion-related.

On remand, however, the Commission further clouded the question. After determining that the property in question was *not* conversion related (which would have settled the issue) it continued:

> Therefore, the ratepayer is not entitled to share in any portion of the proceeds of that sale, unless there was a profit on the depreciable portion of the asset sold. There was none in this case.

D.C. Transit Sys., Inc., (Order No. 563), 63 P.U.R.3d 32, 33–34 (WMATC 1966). This is confusing in that the Commission seemed to say in a casual manner that if the sufficient conversion-relationship *were* shown, the farepayers would have a right to the profit on nondepreciable assets—a principle it has *never* accepted. It is correct in that farepayers are entitled to profits on depreciable properties to some extent regardless of the conversion relationship. And since there was none here, farepayers are not entitled to any portion of the proceeds of the sale. The tricky word is "therefore" and it must be concluded that this is merely ill-considered loose language on the part of the Commission.

The principle boils down to this: farepayers may get the gains on depreciable properties in all situations on that particular asset up to the depreciation reserve, but gain over and above that [42] will not be credited to offset other depreciation obligations incurred on other assets due to the conversion program unless the gains also were occasioned by the conversion. This is a reasonable approach, although it is based on the Commission's rather surprising position of inclining to give all "over and above" gains to the company rather than to the farepayers as is required under its Uniform System of Accounts. Apparently the Commission felt that its accounting procedures never contemplated such extraordinary gains over and above depreciation reserves—and it is true that the whole premise of depreciation is that an asset will usually decline in value to the point of an insignificant predicted salvage figure.

#### (2) "Over and above" gains on depreciable assets

This raises the difficult question of whether farepayers should automatically be entitled to these "over and above" gains. The majority maintains at footnote 227 (last two sentences) that because the farepayers bore the risk of loss up to the total cost of the asset, equitably they should receive the total gain. Since the investors are assured protection of their investment, the majority argues, they have no equitable claim to any gain. However, the better analysis seems to be that the farepayers must undertake in *all* situations to make good the original cost of the asset to the investors because it is assumed that the asset will be consumed in the business and its value dwindle to the point of salvage. This was the expectation in setting up the depreciation schedule and in estimating the useful life of the asset. When these calculations go awry and the

---

41. The asset, the "Georgia & Eastern Terminal," apparently consisted of land and structures and thus had both depreciable and nondepreciable components. The discussion in this case, dealt only with the *depreciable* segments.

42. *See* note 39, *supra.*

salvage value is somewhat higher than predicted, clearly the farepayers should get back their contributions to depreciation to that extent—and this is how the Uniform System of Accounts works. However, when calculations are so far afield that the depreciable asset on retirement brings in not only the total cost, but a sizeable profit as well (a highly unlikely situation), the farepayers in recovering back *only* the amount of their contributions to depreciation and in being relieved of any further depreciation obligation in respect of the asset, nevertheless are receiving an unexpected windfall to that extent. When there is a sizeable profit as well, it seems the Commission is completely justified in departing from normal accounting procedures as it did in D.C. Transit Sys., Inc., (Order No. 4577) 30 P.U.R.3d 405 (D.C.Pub.Utils.Comm'n 1959) and allow both investors and ratepayers to share in these over and above gains according to the equities—one of which is the relation the property bore to the conversion and the enormous obsolescence charges associated therewith. This would appear to be the better rule but I concur in the result reached by the opinion which gives the over and above gains on depreciable properties to the farepayers because of the equities of this particular case.[43]

(3) Analysis of the majority's use of the concept of conversion-relationship with respect to the land

How then does the majority employ the notion of conversion relationship? While at times the majority uses it only as another equitable factor (a role I deem appropriate), at other times it appears to be a dispositive legal consideration. *See supra* at 818. I would simply like to clarify the point that language in our past opinions dealing with conversion relationship has referred solely to depreciable properties, and, as discussed above, there is indisputably a rational basis for distinguishing nonde-

preciable property in this context.[44] Any past discussion of conversion relationship has been with respect to depreciable property already prima facie awarded to farepayers under the Uniform System of Accounts and has involved questions as to the appropriate *sharing* between investors and farepayers as to gains over and above the depreciable cost of the asset. Here, under the Uniform System of Accounts, duly adopted by the Commission, the gains on real property automatically go to *investors* as discussed *supra*. Moreover, under the applicable precedents, once a conversion relationship is found to exist, only then does it become a matter of balancing the equities to determine to what extent farepayers shall share in the proceeds. "The extent to which they are to share depends upon a fair balance between the interests of the public and those of the company's investors." D.C. Transit Sys., Inc. (Order No. 4577) 30 P.U.R.3d 405, 412 (D.C.Pub.Utils. Comm'n 1959).

(4) Summary

Therefore, to summarize the precedents insofar as they address this issue, on close analysis, the method appears to be this: if depreciable property is sold at a gain, those gains belong to the farepayers up to the point of the depreciation reserve of the asset. If there remains any gain over and above that figure, it must be determined whether these properties in question were disposed of as part of the conversion program. If so, *then* the other equities are examined to balance the relative interests of the public and the consumers. Thus the depreciable nature of the property is an essential prerequisite to any conversion-relationship analysis; and in turn, a conversion-relationship is a necessary predicate to any balancing of the equities. In no way is there any precedential support for applying either a conversion-relationship analysis or a balancing of the equities to *nondepreciable*

---

43. For non-conversion-related equities, *see* Part II B 2 b, *infra* at 842.

44. *See supra* at 836–838.

assets. That is not to say that the fact of the conversion-relationship does not create a powerful equity—but rather that any reliance on this concept as an independent source of support based on precedent is misplaced. And certainly with respect to nondepreciable properties *non*related to the conversion, the only conceivable ground for the opinion's similar disposition of the gains in favor of the farepayers is simply the general equities of the situation [45]—which leads to the following discussion.

### b. Other equitable considerations

It is indisputable that the equitable considerations involved in this case preponderate in favor of the farepayers. They have been required to bear the burden of over $10 million in track removal and repaving as well as the $5 million underdepreciated cost of the tracks and streetcars. Moreover, the fact that the conversion program borne by the farepayers freed these parcels of real estate to be disposed of at a profit by the investors is a very compelling equitable consideration.[46] Transit's investors benefited from a purchase of the stock of the company at a cost far below the fair market value of the assets,[47] (not to mention not paying any sort of premium for acquiring a going business with a virtual monopoly assured by charter) and it appears that sizeable dividend returns have been received over the years.[48]

I must note briefly however, that some dispute can be taken with some of the specific factors in the majority opinion. For example, some of the factors cited as benefiting the investors, such as Transit's virtual monopoly position (*supra* at 815), its preferred tax treatment (*supra* at 820), its changeover to an operating ration system of fixing a fair

45. It is recognized that these nonrelated nondepreciable properties represent a very small portion of the assets involved.

46. In this regard it is also noteworthy that the farepayers must bear the cost of maintenance on the properties while in operating status.

47. At the time of acquisition the assets were valued on Capital's books at approximately $23.8 million. Transit's purchase price was about $13.5 million—but the investors had to make up the $10 million difference through the acquisition adjustment account as described in the majority opinion. However, the *market value* of the assets was apparently somewhat higher, exactly how much higher being a debatable point. *See* majority opinion, *supra* at n. 11. It should be noted that technically Capital was acquired by Transit through a purchase of stock. Text accompanying note 257, *supra*. The majority consistently fails to make a distinction between acquisition by purchase of the assets and by purchase of stock. *See, e. g., supra* at 812. It would have been more precise to maintain this distinction between the two methods, especially since it partially explains the purchase price below book value.

The principal reason behind this "bargain" in the purchase of Capital's stock was simply that there were no other acceptable offers at the time. The legislative history of the Franchise Act shows that the Senate originally passed a version under which the transit system would be publicly owned for an interim period of three years until a suitable buyer could be found. S.Rep.No.1791, 84th Cong., 2d Sess. (1956). Prior to this "proposals were received from six applicants for the permit and detailed conferences were held with each. However, the Public Utilities Commission reported that none of the applicants met the requirements considered essential for the issuance of a permit, and no further proposals by private individuals have been submitted to date." *Id.* at 2. Since private ownership was deemed preferable, the conference report indicated that the final arrangement ultimately agreed upon to give the franchise to Transit was considered more acceptable. H.R.Rep.No. 2751, 84th Cong., 2d Sess. (1956). It was apparently a simple case of the price being driven down by a dearth of buyers. It is apparent that the prospects were somewhat less than attractive.

48. On page 815 of the majority opinion, enormous dividends are alluded to. This figure was derived from the Committee Report cited at note 271, but is based on a comparison with the $500,000 cash investment figure rather than the $13.5 million original investment in the company and as such is somewhat misleading and emotional. Since those years, Transit's investors have apparently been doing substantially worse. *See*, No. 24,398.

return as opposed to the old rate base method (*supra* at 815), and the general rise in property values (*supra* at 816), are present in almost every case involving a public utility. To weigh these factors against the investors is tantamount to "fixing" the outcome of the game before it begins. Moreover, we read nowhere in the majority opinion of any equities on the side of the investors. A regulated public utility is a unique operation in which it is often said the investors have only a "fishing license." While they stake their entire investment in the enterprise and face a large downside risk, they have a ceiling on their possible gains (a regulated reasonable rate of return)—and they are not guaranteed this return, but only given the right to "fish" for it. In return for agreeing to this arrangement, they receive a number of advantages such as their monopolistic position, tax preferences and perhaps an operating ratio method of rate determination. Where the investors must bear the entire business risks, consumers bear only the incidental maintenance costs on utility assets and must protect the investors' investment in depreciable property since it has a limited useful life (but not land—land stability is their only protection here). That this arrangement has long been the practice in public utility regulation is admitted by the majority. Yet never before have such factors been considered equitable considerations which militate against the investors, at least to my knowledge. To so hold is equivalent to saying that in every case the equities are against the utility. In our case it is true that the conversion has placed *extraordinary* burdens on the farepayers —and it is these extraordinary burdens which rightly should figure in the equitable balancing process. But I object to "stacking the deck" by adding into the balance the normal incidents of every publicly regulated industry.

### c. Resurrection of "risk of capital loss" under the topic heading of "burdens"

As conceded above, a large part of these "burdens" consist of various equitable factors which weigh generally in favor of the farepayers. However, it seems that an equally large part of the majority's rationale in this "benefit/burden" section is nothing more than a restatement of the erroneous principle that farepayers are entitled to capital gains because of the obsolescence risk of capital loss—*i.e.*, the *first* of the majority's two controlling principles. While supposedly discarding that factor for the purposes of this case,[49] the majority somehow manages to slip it back into the deck with an impressive sleight of hand maneuver. Repeatedly in this section of the majority opinion, there is language about "depreciation" and "obsolescence" burdens of the farepayers.[50] The fact of the matter is that such concepts *simply do not apply to nondepreciable assets* such as land. Such statements as "consumers bear the risk of that loss unless investors have been compensated for assuming it" (text accompanying note 217, *supra*) are completely wrong as to land. What is more important is that they involve identical considerations to those the majority claimed to have set aside.[51] Here we have two basic doctrines advanced to support the result and one consists to a considerable extent of a restatement of the other. And when it is asserted that the one factor is to be shelved, it should not reappear in another form. If truly consistent in this regard, what then would remain of the majority's crucial second "doctrinal consideration", the dispositive benefit/burden analysis? When the repeated doctrine disappears, we are left with only "half a doctrine." On careful scrutiny, then, the marvelously voluminous and

49. I feel it is incorrect as to all cases involving land, of course.

50. *See* text accompanying notes 197, 199, 200–04, 209, 211, *supra*.

51. "At the outset, we lay aside the rule that capital gain accompanies risk of capital loss." *Supra* at 811.

superficially authoritative arguments for the existence of increased farepayer burdens evaporate, leaving a much lightened scalepan on the farepayers' side of the equity balance.[52]

### C. The critical inquiry.

As to the central issue, I find myself in agreement with the majority. The statement that "[a]ccounting directives . . . must survive the test of rationality" (text accompanying note 316, *supra*) precisely frames the question as I would desire. Clearly then our difference centers around whether the majority's "equities" are sufficient to render the Commission's actions irrational, arbitrary and capricious.

To be sure, there is no question that the Commission is not bound by traditional concepts of private enterprise and private property in its treatment of various transactions—at least not by any constitutional considerations. The cases rejecting the fair value theory of rate base and depreciation[53] have demonstrated a marked willingness to accept commission departures from such restraints in public utility ratemaking. As the majority opinion points out, the Supreme Court has said that "[u]nder the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. . . . It is not theory but the impact of the rate order that counts." FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). Therefore conceivably we should look only to the relevant facts and circumstances and proceed to balance the equities. This is essentially what the majority does with respect to the nondepreciable nonrelated properties and, under my analysis what it *must* do with respect to all the land since there does not appear to be any other persuasive justification for the result reached.

Yet while such an approach may be *constitutionally* valid and would undoubtedly be upheld had the agency in fact adopted it, we are not faced with such a situation nor are we operating in a vacuum. There enters another very powerful judicial doctrine—that of deference to agency adherence to rules promulgated under statutory authority unless *arbitrary and capricious*. Again the ultimate question is whether the equities of the situation are so overwhelming that we can say that the Commission's *adherence* to its Uniform System of Accounts and its uniform administrative pronouncements was clearly arbitrary and capricious under the circumstances. It is my conclusion that the Commission's actions were reasonable enough to withstand attack on review. It is true that a system of accounting which is unreasonable may be overturned by this court, yet I cannot agree that because of the equities in this case, the traditional manner of accounting employed here is such a departure from economic realities as to warrant a finding of arbitrariness. Clearly if the Commission were to adopt an accounting procedure like that employed in N.Y. Water Service[54] we would uphold its decision and we now would have before us a different case. Moreover the equities on careful analysis are not so overwhelming as the majority would like to paint them. Many of the numerous factors cited by the majority are makeweights and the valid ones are insufficient to render the Commission's actions arbitrary and unreasonable. The apparent *de novo* review of the agency's procedures in the opinion and the wholly unprecedented treatment of the nondepreciable properties based solely on equitable balancing seems to be stretching the law to reach a desired result.

It is clear that the majority gives very little deference to the applicable ac-

---

52. Consisting of the factors I have summarized in Part II B 2 b, *supra* at 842, 843.

53. Part III of the majority opinion, *supra* at 800–805.

54. *Supra* at 795.

counting rules and the Commission's decision to follow them.[55] It states that "[a]ccounting procedures are not self-justifying" and "[t]o permit an accounting device to dictate the rule of law is to allow the tail to wag the dog. To judicially accept an accounting method without inquiry as to its reasonableness is to pervert the law. And to yield, on judicial review, unquestioning obeisance to administrative authority over utility accounting is to abdicate the responsibility to review." *Supra* at 819. Yet while the judicial responsibility to review, certainly should not be abdicated, neither is it a license to ignore all limits on our discretion. It is the majority, rather, that "perverts" the law in ignoring such firmly embedded concepts in our judicial system as deference to agency procedures. The Supreme Court has spoken decisively on this issue:

> This court is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. *To show that these have been exceeded in the field of action here involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error, or unwisdom is not equivalent to abuse. What has been ordered must appear to be "so entirely at odds with fundamental principles of correct accounting"* (Kansas City Southern Ry. Co. v. United States, 231 U.S. 423, 444, [34 S.Ct. 125, 58 L.Ed. 296]) *as to be the expression of a whim rather than an exercise of judgment.* Norfolk & Western Ry. Co. v. United States, 287 U.S. 134, 141 [53 S.Ct. 52, 77 L.Ed. 218]; Kansas City Southern Ry. Co. v. United States, *supra*, [231 U.S.] p. 456, [34 S.Ct. 125, 58 L.Ed. 296].

American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 236–237, 57 S.Ct. 170, 172, 81 L.Ed. 142 (1936)

(emphasis added). *See also*, Northwestern Electric Co. v. FPC, 321 U.S. 119, 124, 64 S.Ct. 451, 454, 88 L.Ed. 596 (1944) (emphasis added):

> Although . . . the Commission's prescribed method of eliminating the write-up may not accord with the best accounting practice, it is sustained by expert evidence. *It is not for us to determine what is the better practice so long as the Commission has not plainly adopted an obviously arbitrary plan.* [footnotes omitted].

*See also*, D.C. Transit Sys., Inc. v. PUC, 110 U.S.App.D.C. 241, 242, 292 F.2d 734, 735 (1961); Arkansas Power & Light Co. v. FPC, 87 U.S.App.D.C. 385, 185 F.2d 751 (1950); Alabama Power Co. v. FPC, 75 U.S.App.D.C. 315, 128 F.2d 280, cert. denied, 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 525 (1942); Pacific Power & Light Co. v. FPC, 141 F.2d 602 (9th Cir. 1944); Pennsylvania Power & Light Co. v. FPC, 139 F.2d 445 (3d Cir. 1943), cert. denied, 321 U.S. 798, 64 S.Ct. 938, 88 L.Ed. 1086 (1944). To dismiss such an established and sound principle of law so cavalierly is wholly unjustifiable.

I repeat, the majority accords no deference to consistent administrative adherence to widely accepted established accounting procedures—themselves a product of careful policy judgments. It would rather consider each situation individually on the basis of the equities. This effectively injects our court into the regulatory process without benefit of expertise and creates an environment in which we are allowed to give free reign to our equitable inclinations on each factual situation without the restraining parameters of an orderly accounting system. This violates fundamental notions of administrative law and the role of the judiciary.

Brief mention is required as to the majority's claim that it has been cited to no operative accounting rule on the issue at hand. This selective blindness is dif-

---

55. This is also the approach taken by the majority in 24,398. There the majority refers to the applicable accounting system but cavalierly dismisses it as a "technical point." No. 24,398, 158 U.S.App.D.C. at ——, 485 F.2d at 886.

ficult to understand. Surely the majority does not mean to dispute the *existence* of a Uniform System of Accounts. The PUC, for example, repeatedly referred to it in D.C. Transit Sys., Inc., (Order No. 4577) 30 P.U.R.3d 405 (D.C. Pub. Utils. Comm'n 1959): "while cognizant of the desirability of adhering to the Uniform System of Accounts . . . ." (Id. at 410); "starting from the conceded premise that a strict application of the Uniform System of Accounts requires . . . ." (*Id.*); "the Uniform System of Accounts, applicable to accounting procedures of utilities under the jurisdiction of this commission . . . ." (*Id.*). On this precise point the Commission has *informed* us in its brief that: *"Under the system of accounts now in effect,* where property is transferred by Transit from an operating to a non-operating status because it is no longer needed in the company's transit operations, the following results:

(2) As to non-depreciable property, that is property for which no depreciation charge is assessed against the ratepayer, a different result ensues. In this case, the property is merely removed from the rate base at original cost. If there is a gain, that is if the fair market value exceeds original cost, or if there is a loss, there is a credit or charge made to retained earnings, so that the investor receives the full benefit of any gain and the full detriment of any loss.

Depreciable property is a capital item which the investor has put into service which, while it remains in service, is wearing out. As it wears out and thus its value is reduced, the ratepayer reimburses the investor for the reduced value through a depreciation charge which is set to reflect the rate at which the property is assumed to be wearing out. At the time of transfer, the amount of the accumulated depreciation is deducted from the original cost to determine the unrecovered cost. If the fair market value exceeds the unrecovered cost, there is a gain in that amount, and it is fair that the gain be credited to the ratepayer up to the amount he contributed in depreciation charges for that property. At the same time, if the gain exceeds the amount needed to repay the ratepayer in full, it seems equitable that the investor receive that surplus.

With respect to *non-depreciable property*, on the other hand, since the ratepayer makes no contribution to the capital cost, he shares none of the profit if a profit is indicated when the property is taken out of service. The investor has provided the capital to acquire the property and the ratepayer in no way thereafter has provided reimbursement to the investor for that capital outlay, as he has through depreciation charges on depreciable property. While nondepreciable property is in service, the ratepayer pays maintenance and taxes on the property, which expenses are regarded as legitimate operating expenses; but they do not represent a contribution to the capital cost. That cost is borne by the investor; thus, when the nondepreciable property is removed from service, it is equitable that any gain in value over original cost be passed on to the investor.

Respondent's Br. 9–11 (emphasis added). Now is this a failure to cite to us the Commission's Uniform System of Accounts as the majority contends? Is it defective because no section numbers or quotations appear? Or does the majority simply assume that the Commission has lied to us? I think such an assumption wholly unjustified and improper to say the least. Moreover, this cannot be a "post hoc rationalization" since, as the majority admits,[56] the Commission has repeatedly and consistently stated this to be its position and this statement is not contradicted in this record.

56. *Supra* at 798.

A Uniform System of Accounts is not enacted piecemeal. This Agency's system has been in effect since the days of the PUC and the WMATC clearly inherited it *in toto*.[57] It is a broad system of accepted accounting procedures applicable to all regulated industries under the Commission's authority. The enactment of Regulation 61 was necessary because it is in *abrogation* of traditional accounting rules. No such regulation is required where the disposition is in *conformance* with such accounting principles.

And even were there no clear Uniform System of Accounts provision on this issue, my position would be precisely the same. The policy of deference to consistently applied agency procedures and practices in areas of its expertise and authority is well established and incontrovertible. No such deference has even momentarily given the majority pause in its zeal to deal with the issue *de novo*.

Finally, if a close conversion relationship in conjunction with the other equities favoring the farepayers did serve to render the Commission's accounting practices and administrative decisions manifestly unreasonable and arbitrary, there would be insufficient support for this result as to the *non*related nondepreciable properties. The fact that the conversion program, the cost of which was borne by the farepayers, was the *sine qua non* of the gains realized by the investors on the related properties is a strong and appealing equitable factor. And, when joined with the other equitable considerations weighing in favor of the farepayers, I can certainly sympathize if not concur with, the notion that this renders the Commission's accounting procedures unreasonable. However, where the factor of conversion-relationship is absent, it seems clear that it cannot conceivably be said that the general equities alone reach the "critical mass" necessary to a finding of "arbitrary and capricious."

I thus dissent as to all the land (both related and nonrelated to the conversion) and, while concurring in the result as to the depreciable properties, would like to make clear my view that the "over and above" gains should not be considered as inexorably belonging to the investors.